NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted November 1, 2011[*]
Decided November 1, 2011

**Before**

DIANE P. WOOD, *Circuit Judge*

ANN CLAIRE WILLIAMS, *Circuit Judge*

JOHN DANIEL TINDER, *Circuit Judge*

No. 11-2118

| | |
|---|---|
| PATRICK AMALEMBA, *Petitioner*, | Petition for Review of an Order of the Board of Immigration Appeals. |
| *v.* | No. A079 608 642 |
| ERIC H. HOLDER, JR., Attorney General of the United States, *Respondent*. | |

**O R D E R**

Patrick Amalemba, a native and citizen of Kenya, petitions for review of an order of the Board of Immigration Appeals upholding the immigration judge's denial of his requests for asylum, withholding of removal, relief under the United Nations Convention Against Torture (CAT), cancellation of removal, voluntary departure, and adjustment of status. He

---

[*]After examining the briefs and record, we have concluded that oral argument is unnecessary. Thus, the appeal is submitted on the briefs and record. *See* FED. R. APP. P. 34(a)(2)(C).

also seeks review of the Board's denial of his motion to reopen and remand removal proceedings. We deny the petition in part and dismiss it in part for lack of jurisdiction.

Amalemba came to the United States on a student visa in 1997 and overstayed. In 2001 he married a United States citizen. The government commenced removal proceedings against him in 2009, charging him as an overstay, *see* 8 U.S.C. § 1227(a)(1)(B). During a hearing before the IJ, Amalemba conceded removability and requested voluntary departure, cancellation of removal, and adjustment of status. The IJ denied Amalemba's requests and ordered him removed. Amalemba appealed from the IJ's decision; the BIA remanded the case because the IJ had not discussed Amalemba's mental competency (which had been called into question by police reports that Amalemba had been investigated for resisting arrest, domestic violence, and threatening to bomb the University of Notre Dame and the South Bend airport during a visit by the President of the United States). Based on a psychologist's evaluation, the IJ found Amalemba competent.

While his case was on remand, Amalemba applied for asylum, withholding of removal, and CAT protection, indicating on his Form I-589 that he sought such relief due to his "political opinion" and "membership in a particular social group." During his second merits hearing, Amalemba—appearing pro se[1]—testified that he is of Luhya ethnicity and that in 1996, while he was working as an election monitor for the Electoral Commission of Kenya, he was attacked by members of the violent Mungiki sect, who are of Kikuyu ethnicity.[2] Amalemba said that during this episode a group of Kikuyu-speaking men

---

[1] Amalemba was represented by counsel during earlier appearances before the IJ, but his attorney moved to withdraw two months before the second merits hearing, explaining that she could not build a defense for Amalemba due to the total lack of assistance from his wife and others. The IJ granted the motion to withdraw and offered Amalemba the opportunity to obtain other counsel before proceeding; Amalemba responded, "I will go ahead, intelligently waive counsel, and I will represent myself."

[2] Amalemba's tribe—the Luhya—is the second-largest ethnic tribe in Kenya, trailing only the Kikuyu tribe in size. *See Kenya Defends Tribal Census Figures*, BBC NEWS (Aug. 31, 2010), http://www.bbc.co.uk/news/world-africa-11143914. There has been a history of ethnic conflict between the Luhya and Kikuyu tribes. *See* John O. Ouch, UNDERCURRENTS OF ETHNIC CONFLICT IN KENYA 58 (2002). Members of the Mungiki, a sect whose name is a Kikuyu word for "multitude," are drawn primarily from the Kikuyu tribe and are known for promoting female circumcision, controlling public transport routes, extorting money, and beheading police informers; the Mungiki are believed to be linked to high-profile politicians. *See Profile: Kenya's Secretive Mungiki Sect*, BBC NEWS (May 24, 2007),

(continued...)

accosted and taunted him for belonging to the Kenya African National Union (KANU) and for being uncircumcised, as he said the Luhya typically are.[3] The men then attacked him; he testified that they burned his leg, stabbed him in the arm, and "forcibly circumcised" him—spilling "blood all over" until he lost consciousness. He said he was taken by bystanders to the hospital, where he was operated upon and received skin grafting for a "gaping hole" in his "private area." He said that newspapers reported on this attack.

After his arrival in the United States, Amalemba testified, his family members were killed due to "ethnic violence related to politics." His uncle, he said, was poisoned in 1998 while staying in a Kikuyu area. His brother, he testified, was shot in 2000 by a policeman who mistook him for a Mungiki member due to his dreadlocks (a hairstyle popular among Mungiki); the policeman who shot Amalemba's brother was later prosecuted and convicted for this attack. Amalemba also testified that his aunt was beaten to death in 2003 in an area of Nairobi containing "active Mungiki members." Finally, Amalemba testified that his father—who always wore a pin for the KANU political party on his lapel—was found dead in Nairobi's city center with the pin ripped from the lapel. Amalemba stated that he feared returning to Kenya "because of the death that my family has faced because of the politics, and people involved in the politics threatening our family." He also noted that his brother's grave had been desecrated, that threats have been made on his mother's life, and that his mother moved to a new home to escape the threat of violence.

Testimony was also presented by Father Patrick Wangai, Amalemba's longtime friend from Kenya. Wangai—who saw Amalemba's brother's body at the morgue—testified that Amalemba's brother had cut off his dreadlocks before he was killed. Wangai believed that Amalemba's brother was killed by a policeman hired by his supervisors after he exposed corruption at his company. Wangai also stated that he had never seen Amalemba's father wearing a KANU pin and that he could not "exclusively say" that Amalemba's father belonged to any particular political party. He believed that Amalemba's father was poisoned by villagers who were jealous of his modern brick home.

---

[2](...continued) http://news.bbc.co.uk/2/hi/africa/6685393.stm; *see also Gautama v. Holder*, 578 F.3d 611, 613 (7th Cir. 2009) (describing the Mungiki).

[3] Amalemba testified that members of the Luhya tribe are typically not circumcised, although news reports suggest that circumcision is a common practice among members of that tribe. *See* Muliro Telewa, *Kenyan MPs Admit to Circumcision*, BBC NEWS (Sept. 23, 2008), http://news.bbc.co.uk/2/hi/7584269.stm; Robyn Dixon, *Forced Circumcision Reported in Kenya*, LOS ANGELES TIMES (Jan. 9, 2008), http://articles.latimes.com/2008/jan/09/world/fg-circumcision9.

The IJ denied Amalemba's requests for relief. In denying his requests for asylum and withholding of removal, the IJ found Amalemba not credible, noting material discrepancies between his and Wangai's testimony over the circumstances surrounding his brother's and father's deaths. Because Amalemba failed to provide corroborating evidence—such as medical records and newspaper articles concerning his alleged 1996 attack, death certificates for his family members, transcripts from the trial of his brother's murderer, or sworn affidavits from family members—despite earlier instructions to do so, the IJ concluded that Amalemba could not prove that he suffered harm in the alleged attack; that a "nexus" existed between past harm and a protected ground; or that he had a well-founded fear of future persecution. The IJ also denied CAT protection, finding no evidence that Amalemba would likely face torture if he were removed to Kenya. The IJ also denied Amalemba's request for cancellation of removal on grounds that he had not shown that his wife would suffer "exceptional hardship" if he were removed. Alternatively, the IJ denied Amalemba's request for cancellation, along with his applications for adjustment of status and voluntary departure, as an exercise of discretion in light of the police reports that he had been investigated for resisting arrest, domestic violence, and making threats.

Amalemba appealed to the BIA, primarily arguing that the IJ erred in finding him not credible and violated his due-process rights by considering the police reports. He subsequently submitted a motion to reopen and remand his case for consideration of new evidence—including transcripts from the trial of his brother's murderer from the Kisumu High Court (Kenya), his brother's autopsy report, his father's death certificate, a sworn declaration from his mother, and newspaper articles about political conflict in Kenya—that he had submitted with his appeal brief. The BIA upheld the IJ's rulings and denied Amalemba's motion to reopen, concluding that Amalemba had not shown that any of this new evidence was previously unavailable, that it would alter the outcome of his case, or that it demonstrated prima facie eligibility for the relief sought.

In his petition for review, Amalemba first argues that the IJ and BIA erred in rejecting his claims for asylum and withholding of removal on the basis of an adverse credibility determination. He urges that the credibility assessment was based on "inadvertent" misstatements about his brother's and father's deaths and "easily explained discrepancies" between his and Wangai's testimony, and he argues that he was not given a chance to explain these inconsistencies.

We review deferentially the IJ's and BIA's credibility determinations, *Hassan v. Holder*, 571 F.3d 631, 637 (7th Cir. 2009), and here the agency's adverse credibility finding is supported by specific, cogent reasons—significant discrepancies between Amalemba's and Wangai's testimony relating to the circumstances surrounding the deaths of Amalemba's

father and brother. In his brief, Amalemba does not resolve the discrepant testimony, but instead concedes that he was mistaken in believing that his brother had dreadlocks at the time of his death. Additionally, the new assertion in his brief that his brother was killed by a "policeman hired by a politician with ties to the Mungiki" is not reflected anywhere in the administrative record and we may not consider it. *See* 8 U.S.C. § 1252(b)(4)(A). Moreover, the record belies his contention that he had no opportunity to resolve the inconsistencies before the IJ; he conducted a redirect examination of Wangai, and when the IJ asked at the end of the hearing whether there was anything else he wanted to address, he replied no. Because Amalemba never resolved the inconsistent testimony during the administrative process, the IJ and Board reasonably rejected his testimony as not credible.

Amalemba also argues that the IJ erred in determining that he did not provide reasonably available corroborating evidence, pointing to the documents that he submitted to the BIA. But Amalemba did not present these documents to the IJ; he testified that he left some documents at his home in Indiana and that others could not be timely obtained due to his pre-hearing detention, but he did not explain why his wife or Wangai could not have helped him obtain these documents. Under these circumstances, and given the burden of proof on Amalemba, *see* 8 U.S.C. § 1158(b)(1)(B)(I), the IJ did not err in holding that corroborating evidence was reasonably obtainable and that Amalemba failed to meet his burden of proof. *See id.* § 1252(b)(4).

Next Amalemba argues that the IJ and BIA erred in rejecting his claim for CAT protection; he contends that the Mungiki has inflicted "mental torture" upon him by killing his family and desecrating their graves, removing his father's KANU pin, and threatening his mother's life. He asserts that the Kenyan government would acquiesce in this torture because the Mungiki who have infiltrated the government continue to threaten his family. He also argues that the Mungiki have "infiltrated the police and have committed arbitrary and unlawful killings." But Amalemba points to no evidence in the record that compels the finding that he, in particular, would likely be tortured if removed to Kenya, as required for CAT relief. *See* 8 C.F.R. § 1208.16(c)(2); *Toure v. Holder*, 624 F.3d 422, 429 (7th Cir. 2010).

Amalemba also asserts that the agency abused its discretion in denying his applications for cancellation of removal, adjustment of status, and voluntary departure. He says that these discretionary determinations deprived him of due process because (1) the IJ was biased against him in crediting the police reports, (2) he was not allowed to cross-examine the public officials who drafted these reports, (3) these reports were not probative because they did not lead to criminal charges or conviction, (4) he could not adequately prepare for his case while he was detained, and (5) he was not competent to participate in the hearings due to his lack of medication for a mood disorder.

We lack jurisdiction to consider these denials of discretionary relief from removal, unless Amalemba raises a constitutional claim or a question of law. 8 U.S.C. § 1252(a)(2)(B)(i), (a)(2)(D); *Ward v. Holder*, 632 F.3d 395, 397 (7th Cir. 2011); *Jarad v. Gonzales*, 461 F.3d 867, 869 (7th Cir. 2006). Amalemba broadly invoked a due-process claim, but this argument fails because he has no liberty or property interest under the Due Process Clause in obtaining purely discretionary relief from removal. *See Moosa v. Holder*, 644 F.3d 380, 385 (7th Cir. 2011); *Bakarian v. Mukasey*, 541 F.3d 775, 785 (7th Cir. 2008).

Finally, Amalemba contends that the BIA abused its discretion in denying his motion to reopen because, in his view, he introduced ample evidence that was new and material, including trial transcripts from the Kisumu High Court, his brother's autopsy report, his father's death certificate, a sworn declaration from his mother, and newspaper articles. But the Board properly exercised its discretion in denying the motion because he did not show that the evidence was unavailable, that it would alter the outcome of the case, or that it established a prima facie case for asylum, withholding of removal, or CAT protection. *See* 8 C.F.R. § 1003.2(c)(1); *Victor v. Holder*, 616 F.3d 705, 710 (7th Cir. 2010).

We **DENY** Amalemba's petition for review of the agency's denial of his requests for asylum, withholding of removal, CAT relief, and his motion to reopen and remand removal proceedings. We **DISMISS** for lack of jurisdiction the petition for review of the agency's denial of cancellation of removal, voluntary departure, and adjustment of status.