# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 11-3396

KEVIN K. WANJIRU,

*Petitioner*,

*v.*

ERIC H. HOLDER, JR., Attorney General
of the United States,

*Respondent.*

Petition for Review of an Order of the
Board of Immigration Appeals.
No. A087 676 971

ARGUED SEPTEMBER 12, 2012—DECIDED JANUARY 11, 2013

Before FLAUM, WOOD, and HAMILTON, *Circuit Judges.*

WOOD, *Circuit Judge.* Kevin Wanjiru is seeking to avoid removal to Kenya, his native country, because he believes that, if this occurs, he will be tortured and then murdered by a group called the Mungiki. An Immigration Judge (IJ) concluded that Wanjiru had failed to prove that these dire consequences were more likely than not. Wanjiru also did not persuade the IJ that the

Kenyan government would acquiesce in the Mungiki's violent acts. The IJ therefore denied Wanjiru's application for deferral of removal pursuant to the U.N. Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (the CAT), to which the United States is a party. After the Board of Immigration Appeals upheld the IJ's determination, Wanjiru filed this petition for review. We conclude that we have jurisdiction to adjudicate this petition, and that it must be granted.

## I

The Mungiki are a violent, outlawed sect in Kenya; they are notorious for extortion, torture, and murder by dismemberment. The U.N. High Commissioner for Refugees (UNHCR) describes them as "a secretive, quasi-religious, part gang, part mafia-like group that engages in criminal activity and violent intimidation." See "Kenya: Activities of the Mungiki sect and response by government authorities (2008–October 2009)," *available at* http://www.unhcr.org/ refworld/topic,463af2212,469f2e382, 4b20f048c,0,,,.html (last visited Jan. 8, 2013). The UNHCR report notes that the Mungiki "tax" public transportation and access to public services; that they are infamous for beheading their victims; that they may be closely allied with senior politicians in the government; and that in October 2008 a police officer who provided information against them was killed. See also Christopher Goffard, *Court Sheds Light on Scary Gang,* L.A. TIMES, *available at* http://articles.latimes.com/2011/nov/27/world/la-fg-kenya-mungiki-20111127 (Mungiki "may be the biggest and most

dangerous gang in the world"); Adam Mynott, *Rule of Law Reels in Kenya,* BBC NEWS, March 6, 2009, *available at* http://news.bbc.co.uk/2/hi/africa/7928519.stm (Mungiki murdered over 1,500 people in post-election violence in 2007). Although the Kenyan government has tried to bring the group under control, recent reports indicate that it has not yet managed to do so. See, *e.g.,* Bernard Momanyi, *Resurgent Mungiki targeted in fresh crackdown,* Capital FM News (May 23, 2012), *available at* http://www. capitalfm.co.ke/news/2012/05/resurgent-mungiki-targeted-in-fresh-crackdown/.

At the age of 14, when he was still living in Kenya, Wanjiru accepted his teacher's invitation to join the Mungiki. He had no idea at the time of the group's violent character. After he became a member, he was afraid to leave, knowing that the Mungiki punish defectors by executing them. When Wanjiru was about 20 years old, however, he saw a way out. He came to the United States, traveling legally on a student visa, and was admitted at Detroit, Michigan, on March 24, 2005. He briefly attended Shawnee State University in Ohio, transferred after one semester (without permission from the government) to a community college in Austin, Texas, and finally settled in Lexington, Kentucky, in 2008.

## II

Wanjiru came to the attention of the immigration authorities after he was charged in 2009 with the sexual assault

of a young woman he met in a Lexington nightclub. Apparently Wanjiru was drunk and there was a sexual encounter, the details of which were disputed. In the end, Wanjiru accepted a plea agreement under which he pleaded guilty to the misdemeanor of having "sexual intercourse . . . with another person without the latter's consent." KY. REV. STAT. ANN. § 510.140 (West). He received a suspended sentence of one year, conditioned upon his surrender to the immigration authorities.

Immigration and Customs Enforcement (ICE), which is part of the U.S. Department of Homeland Security, initiated removal proceedings against Wanjiru. He conceded removability as charged, but he petitioned for both withholding of removal under 8 U.S.C. § 1231(b)(3) and deferral of removal under the CAT. The IJ first found that the statute under which Wanjiru was convicted required lack of consent, and thus it described a "particularly serious crime" within the meaning of 8 U.S.C. § 1231(b)(3)(B)(ii). Because withholding of removal is not available to aliens convicted of such a crime, the hearing turned to the question whether Wanjiru was eligible for deferral of removal. See 8 C.F.R. § 1208.16(c)(4) (stating that protection under the CAT may take the form either of withholding of removal or deferral of removal); see also 8 C.F.R. § 1208.17(a).

Wanjiru testified at some length about his role in the Mungiki and why he still fears being returned to Kenya. His duties as a Mungiki member began upon his enrollment in college in Nairobi; at that time, he was responsible for taking up collections for the Mungiki from local

businesses. Wanjiru said that he never threatened anyone, but that the businesses always paid. He denied personally engaging in violence, but he admitted that he knew that the Mungiki murdered other members who tried to leave the group. As we noted earlier, he explained that he remained a member during that period because he was afraid to cut his ties with them. He has not told his family, apart from his grandfather and his cousin, about his joining the Mungiki, because the gang enforces a strict code of secrecy.

With respect to a possible return to Kenya, Wanjiru swore that even after this lapse of time, the Mungiki would recognize him and either kill him immediately as a defector or force him to choose between rejoining the group and death. He also fears that the Kenyan police would recognize him as a Mungiki and mistakenly think that he was still involved with the outlawed group. In the latter event, he believes that the police would either shoot him on sight (as he asserts they have done with other Mungiki) or force him to cooperate and identify Mungiki members (which he said would lead quickly to his death). Exactly this happened to Wanjiru's cousin Thomas, who was also a Mungiki member. Thomas was arrested by the Kenyan police and released only after revealing the identities of other Mungiki. He fled to Dubai for two years, at which point he thought that it was safe for him to return to Kenya. He was wrong. Shortly after his return, he disappeared. Eventually his family found the remains of his mutilated body—the work of the Mungiki, Wanjiru believes.

On cross-examination, when asked to name fellow Mungiki members, Wanjiru first insisted that he could not "specify their names." When pressed further, he volunteered the names of his murdered cousin Thomas and his best friend John Jaro, but when asked to name more, he repeated that he "couldn't really recall their names, not all of them." On redirect, when asked why he could not remember more names, Wanjiru explained "Like I knew their names, but I didn't want to specify." He also commented that most members went only by one name or a nickname, and that he did not know their full names. He was certain, however, that many of them would recognize his face.

The IJ denied both forms of relief, concluding that Wanjiru had "failed generally to establish eligibility" under the CAT. The judge did not make an explicit credibility determination, but he did note several inconsistencies in Wanjiru's testimony. Wanjiru testified, for instance, that the Kenyan police had a "shoot to kill" order for suspected Mungiki, but his cousin Thomas had been arrested first, not shot on sight. Moreover, Wanjiru asserted that the Kenyan government turned a blind eye to the Mungiki, but the IJ found this to be inconsistent with Wanjiru's professed fear of the police and the "shoot to kill" order.

Wanjiru appealed the IJ's decision to the Board, which concluded that the IJ had erred by failing to make specific findings of fact on such critical points as Wanjiru's credibility, whether he was likely to be tortured, and whether the Kenyan government would

acquiesce in torture. The Board remanded the case to the IJ for this additional work.

On remand the parties agreed to dispense with a second hearing and have the IJ decide on the basis of the record that already existed. Once again, the IJ denied relief, this time in a thorough and detailed opinion. Although he expressed a few reservations about Wanjiru's credibility, noting that Wanjiru did not know the group's political goals and could not name more than two members, on the whole he found Wanjiru's testimony credible because it was "spontaneous, plausible, and detailed." Even so, the IJ found that Wanjiru had not proven that it was more likely than not that he would be targeted by either the Mungiki or the Kenyan police. Furthermore, the judge found, even if the Mungiki did target Wanjiru, he had not shown that the Kenyan government would acquiesce in his murder.

Wanjiru again appealed to the Board, which affirmed the IJ's new decision. The Board ruled that Wanjiru failed to demonstrate that the Mungiki would recognize him, in light of his six-year absence from Kenya and what it saw as his failure to recall members' names. Even if they did recognize him, the Board found, the Kenyan government has been actively fighting the Mungiki. It thus did not believe that the government would acquiesce if the Mungiki tried either to torture or murder Wanjiru. The Board also rejected Wanjiru's argument that the Kenyan police would question him, and that if questioned he would have to cooperate, and if he cooperated he would be executed just like his cousin Thomas.

Wanjiru petitioned *pro se* for review. In response, the government initially argued that this court lacked jurisdiction over the petition, based on 8 U.S.C. § 1252(a)(2)(C), because Wanjiru's sexual misconduct conviction was a crime involving moral turpitude. As we explain below, it later changed its position. This court decided to recruit counsel for Wanjiru, so that his case could be presented more fully and, to the extent applicable, our decision in *Issaq v. Holder,* 617 F.3d 962 (7th Cir. 2010), could be taken into account. The case has now been fully briefed by counsel for Wanjiru, whose efforts the court appreciates, and by the government, and is ready for decision.

## III

### A

Although the government now concedes that this court has jurisdiction over Wanjiru's petition for review, we must nevertheless assure ourselves that this is so before proceeding to the merits. The question is whether the jurisdiction-stripping provision found at 8 U.S.C. § 1252(a)(2)(C) applies to a denial of *deferral* of removal, as opposed to "a final order of removal" by reason of the alien's having committed certain criminal offenses—specifically, a crime of moral turpitude or a controlled substance crime, 8 U.S.C. § 1182(a)(2), an aggravated felony, *id.* § 1227(a)(2)(A)(iii), most controlled substance offenses, *id.* § 1227(a)(2)(B), certain firearms offenses, *id.* § 1227(a)(2)(C), several miscellaneous

crimes (not relevant to Wanjiru), *id.* § 1227(a)(2)(D), or multiple crimes of moral turpitude, *id.* § 1227(a)(2)(A)(ii). Wanjiru concedes that his sexual misconduct misdemeanor was a crime of moral turpitude, and so we must consider whether § 1252(a)(2)(C) deprives us of jurisdiction to entertain his petition.

The government points out that even though two of the statutory provisions listed above—8 U.S.C. § 1182(a)(2) and 8 U.S.C. § 1227(a)(2)(A)(ii)—cover crimes involving moral turpitude, neither triggers the application of the jurisdictional bar because Wanjiru's earlier offense does not meet the criteria of either one. Section 1182(a)(2), the government explains, covers criminal aliens who are seeking admission to the United States; Wanjiru does not belong in that group because he entered the country lawfully (even if he stayed too long) and did not commit his crime until he was here. Section 1227(a)(2)(A)(ii) is inapplicable for a different reason: it requires multiple criminal convictions for crimes of moral turpitude, but Wanjiru has only one such conviction. Congress, in short, did not include Wanjiru's situation in the set of offenses that give rise to the jurisdictional bar, and so, the government concludes, we can proceed. This is the result that the Fifth Circuit reached in *Lee v. Gonzales,* 410 F.3d 778, 781-82 (5th Cir. 2005), although we note that the Eleventh Circuit seems to have come to the opposite conclusion, though without focusing on the issue. See *Vuksanovic v. U.S. Attorney General,* 439 F.3d 1308, 1309-10 (11th Cir. 2006).

We see no reason not to take Congress at its word. There would be no point to the careful list of offenses

covered by § 1252(a)(2)(C) if courts were to start adding offenses willy-nilly. It is not irrational for Congress to draw a line between those who are seeking admission to the country and those who are already here, whether legally or illegally; whether we would have drawn the same line is neither here nor there.

Given this conclusion, it is not strictly necessary to rely on the alternate theory that Wanjiru's lawyers have advanced, relying on dicta in our decision in *Issaq v. Holder*, 617 F.3d 962, 969-70 (7th Cir. 2010). Since there is a split in the circuits on this point, however, we think it prudent to explain further why § 1252(a)(2)(C) does not bar judicial review of a request for deferral of removal.

B

In *Issaq*, we discussed the difference between petitions for withholding of removal and petitions for relief under the CAT. The former offer only one form of relief—withholding of removal—while the latter offer both withholding of removal and deferral of removal. The Executive Office for Immigration Review (EOIR) of the U.S. Department of Justice has a Fact Sheet in which it has described the difference between these two forms of relief, as they relate to the CAT:

- **Withholding of Removal (Under CAT)**

  Withholding of removal (under CAT) prohibits returning aliens to a specific country where they would face torture. It is a more secure

form of protection than deferral of removal. It can be terminated only if [the Department of Homeland Security] establishes that an alien is not likely to be tortured in that country.

• **Deferral of Removal**

Deferral of removal also prohibits returning aliens to a specific country where they would face torture. However, deferral of removal is granted to aliens who likely would face torture but who are ineligible for withholding of removal (under CAT), for example, certain criminals and persecutors.

Deferral of removal is a more temporary form of protection. It can be terminated more quickly and easily if an alien no longer is likely to be tortured in the country of removal, or if the U.S. government receives assurances that the alien will not be tortured if returned.

EOIR Fact Sheet, "Asylum and Withholding of Removal Relief, Convention Against Torture Protections," Jan. 15, 2009. Even in cases that do not implicate the CAT, the Attorney General has the authority to withhold the removal of an alien if he or she decides that the alien's life or freedom would be threatened in the country of removal on account of a protected ground. See 8 U.S.C. § 1231(b)(3); 8 C.F.R. § 1208.16(a), (b). (There is an exception for those who participated in Nazi persecution, genocide, or the commission of an act of torture or extrajudicial killing, but the government has not relied on that in Wanjiru's case.)

The section of the Immigration and Nationality Act that governs judicial review of orders of removal provides that "no court shall have jurisdiction to review" various kinds of denials of discretionary relief (not including either withholding or deferral of removal), 8 U.S.C. § 1252(a)(2)(B), nor (as we noted earlier) shall any court have jurisdiction to review a "final order of removal" against certain criminal aliens, 8 U.S.C. § 1252(a)(2)(C). The question we discussed in *Issaq* was whether these jurisdictional bars apply to an order denying deferral of removal under the CAT. The language of the statute tells us that the answer is no. Section 1252(a)(2)(C) addresses only judicial review of final orders of removal. A deferral of removal is like an injunction: for the time being, it prevents the government from removing the person in question, but it can be revisited if circumstances change. See generally *Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367 (1992) (discussing circumstances under which a final consent decree can be reopened for modification); *Ali v. Achem,* 468 F.3d 462, 471 n.5 (7th Cir. 2006). That is why such an order can be final enough to permit judicial review, but at the same time not be the kind of "final" order covered by § 1252(a)(2)(C).

In that respect, deferral-of-removal orders do not stand alone in immigration law. In *Calma v. Holder,* 663 F.3d 868, 876-77 (7th Cir. 2011), we held that judicial review is available under certain circumstances when an immigration judge denies a motion for a continuance, even if there would be no jurisdiction to review the Board's ultimate decision. Like a continuance, a deferral decision can, in effect, be the dispositive ruling in a case:

if deferral is denied and the person is returned to torture or death, there will be no second chance. The Ninth Circuit reached the same conclusion as ours, although on somewhat different grounds, in *Lemus-Galvan v. Mukasey*, 518 F.3d 1081 (9th Cir. 2008). There it held that § 1252(a)(2)(C) does not apply to judicial review of deferral-of-removal decisions because they are inevitably decisions "on the merits" of the question whether it is more likely than not that the applicant will be tortured upon his return to the country at issue. 518 F.3d at 1084. Although other circuits have concluded that § 1252(a)(2)(C) bars judicial review of a denial of deferral of removal, see, *e.g.*, *Pieschacon-Villegas v. Attorney Gen. of U.S.*, 671 F.3d 303, 309 (3d Cir. 2011); *Saintha v. Mukasey*, 516 F.3d 243, 248 (4th Cir. 2008), they did so without any discussion, and we do not find that position persuasive. We should not lightly presume that Congress has shut off avenues of judicial review that ensure this country's compliance with its obligations under an international treaty, see *Murray v. Schooner Charming Betsy*, 2 Cranch 64, 118 (1804). Instead, we should bear in mind the Supreme Court's admonition that canons of construction favor statutory interpretations that preserve judicial review. See *Kucana v. Holder*, 130 S. Ct. 827, 839 (2010); *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 434 (1995).

**IV**

Turning to the merits, we must decide whether the decision of the IJ and the Board that Wanjiru failed to show that it is more likely than not that he will be

tortured if he is returned to Kenya is properly supported by the evidence. See 8 C.F.R. § 1208.16(c). The CAT's implementing regulations define torture as "severe pain or suffering . . . inflicted by or at the instigation of or with the consent or acquiescence of a public official." 8 C.F.R. § 208.18. Because the Board affirmed and supplemented the IJ's decision with a short order, we review the IJ's order as so supplemented. See *Sarhan v. Holder,* 658 F.3d 649, 653 (7th Cir. 2011). It is Wanjiru's burden to show that the administrative decision was not supported by substantial evidence. *Balliu v. Gonzales,* 467 F.3d 609, 612 (7th Cir. 2006).

The key question is whether the Board's conclusion that Wanjiru failed to make a convincing enough showing that the Mungiki (or the police, mistaking him for a Mungiki) will target him in particular is supported by substantial evidence. Wanjiru relied principally on his own testimony, which, after the remand, the IJ found to be credible. And there was evidence in the record supporting the proposition that the Mungiki in general are violent, especially toward their former members. See, *e.g., Mungiki: Tribal Terrorism in Kenya,* R. at 719; *Murdered: Sect Members Who Said No*, R. at 712. See also *Gatimi v. Holder,* 578 F.3d 611, 613-14 (7th Cir. 2009) (defector was tortured by Mungiki and police refused to protect him). On the other hand, a person petitioning for relief under the CAT must do more than show some connection between himself and the feared torturers (here, the Mungiki) in order to prevail. This court has upheld at least one other Board decision in which the Board rejected as not credible the claim of an alien who

said that he feared the Mungiki. *Amalemba v. Holder,* 444 F. App'x 94, 98 (7th Cir. 2011).

The Board was not convinced that the Mungiki would recognize Wanjiru after such a long absence: Wanjiru was a relatively low-ranking member of the Mungiki; he defected from the group in 2005; and he was unable (so the IJ and the Board thought) to name other members of the group. But Wanjiru testified that he was "80 or 90 percent" certain that other Mungiki would recognize his face from the meetings. Moreover, his reluctance to name names did not come from ignorance. A careful examination of his testimony reveals that he was refusing to identify other members of Mungiki, not that he was unable to do so. As he put it, "Like I knew their names, but I didn't want to specify." The fate that befell Wanjiru's cousin Thomas also sheds light on both the fatal consequences of informing on the Mungiki and the length of the group's memory—Thomas had been gone for two years, but he was promptly punished, according to the testimony credited by the IJ.

It is also unlikely that Wanjiru could avoid the attention of the Mungiki by relocating to a different part of the country. Although there are some 43 million people in Kenya, it is not one homogeneous whole. To the contrary, there are many tribes, and there are at least 69 languages in use nationwide. See Ethnologue: Languages of the World 141 (M. Paul Lewis ed., 16th ed. 2009), *available at* http://www.ethnologue.com/show_country.asp?name=KE. Most Kenyans speak either English or Swahili (or both), and also their own tribal language. Wanjiru's tribe is

the Kikuyu; approximately seven million people speak Kikuyu, or about 20% of Kenya's population. CIA World Factbook, https://www.cia.gov/library/publications/the-world-factbook/geos/ke.html. The tribal and linguistic divisions in the country mean that it is not easy to relocate from one area to another, and if someone were to do so, the outsider would stick out because of his inability to speak the local language (at least without an accent). A person moving into another tribe's area might also be compelled to renounce his own heritage, wealth, and social status; persecution of a Kikuyu is also possible given the existence of hostility in some quarters to that group. See Timothy Parsons, *Being Kikuyu in Meru: Challenging the Tribal Geography of Colonial Kenya*, 53 J. Afr. Hist. 65, 67 (2012).

The IJ found that the Mungiki would probably forgive Wanjiru's defection and leave him alone, but the Board did not mention this finding, and the government concedes that "the record amply demonstrates that the Mungiki murder defectors." Wanjiru testified credibly that this practice is not limited to Mungiki leaders, and the Board never explained why that fact did not support Wanjiru's case.

Finally, the IJ dismissed as "mere allegations" the extensive evidence in the record showing that the Kenyan police and government officials ignore or even actively support the Mungiki; the Board once again was silent on this point. It therefore did not confront one of Wanjiru's principal points, namely, that the Kenyan police are two-faced in this respect. Thousands of

Mungiki have been shot summarily by police death squads, while at the same time, corrupt government officials have abetted and even directed the Mungiki. The International Criminal Court in the Hague confirmed charges (a step similar to finding probable cause) against Kenya's former Deputy Finance Minister and its former Deputy Prime Minister for allegedly using the Mungiki to murder and rape thousands of Kenyans in the wake of a disputed presidential election in late 2007 and early 2008. See *Prosecutor v. Francis Kirimi Muthaura,* et al., Case No. ICC-01/09-02/11, Decision on the Confirmation of Charges, pp. 143-50 (Jan. 23, 2012), *available at* http://www.icc-cpi.int/iccdocs/doc/doc1314543.pdf. (Their trials are scheduled for 2013; the IJ was aware that prosecutors were bringing these charges. R. at 742.) This supporting material cannot be brushed away as the product of Wanjiru's imagination. It is evidence with which the Board should have come to grips.

**V**

Wanjiru may not be the most sympathetic person to come before the immigration authorities: he pleaded guilty to the misdemeanor of having sexual intercourse with a woman without her consent. But the CAT does not exist only for persons with an unblemished record. Indeed, the possibility of deferring removal rather than withholding it altogether exists for people such as Wanjiru, who might be undesirables at some level but who are entitled not to be sent to a country where they will experience torture. See *Negusie v. Holder,* 555 U.S. 511,

541-42 (2009) (Thomas, J., dissenting). Here both the documentary evidence and Wanjiru's testimony (which, to repeat, the IJ found credible) support the conclusion that the Mungiki will probably murder Wanjiru with the acquiescence of Kenyan government officials, if he is returned. See 8 C.F.R. § 1208.16(c)(2). And it is worth remembering that even if Wanjiru ultimately prevails in his quest to obtain deferral of removal, the government has the authority to keep him in custody pursuant to 8 C.F.R. § 1208.17(c) until such time as he may safely be removed to either Kenya or a willing third country. See *Ali v. Achim*, 468 F.3d 462, 471 n.5 (7th Cir. 2006). Wanjiru is saying, in effect, that he would rather live in a U.S. jail than risk return to Kenya.

The petition for review is GRANTED and the case is REMANDED to the Board of Immigration Appeals for further proceedings consistent with this opinion.