# United States Court of Appeals

### For the Eighth Circuit

_____

No. 12-2489

_____

Francis Muiruri Gathungu; Jane Mumbi Mugo;
Nyambura Muiruri; Wambui Muiruri

*Petitioner*s

v.

Eric H. Holder, Jr., Attorney General
of the United States

*Respondent*

_____

Petition for Review of an Order of the
Board of Immigration Appeals

_____

Submitted: February 14, 2013
Filed: August 6, 2013

_____

Before SMITH, MELLOY, and BENTON, Circuit Judges.

_____

MELLOY, Circuit Judge.

Petitioners Francis Gathungu, Jane Mugo, and their two minor daughters petition for review of the Board of Immigration Appeals' ("BIA") order denying asylum and withholding of removal. We grant the petition and remand for further proceedings consistent with this opinion.

I. Background

We recount the procedural history of this case and briefly summarize the relevant evidence. Unless otherwise indicated, the facts below are drawn from Petitioner Gathungu's testimony before the Immigration Judge ("IJ").

Petitioners are Kenyan citizens. In the 1990s, Gathungu, who is a member of the Kikuyu tribe, operated a variety of small businesses in Kenya. Sometime during or around 1997, attackers allegedly affiliated with the Kenyan government destroyed his businesses. Gathungu then formed a self-help group called Kamucii to help Kikuyus develop new businesses. Shortly thereafter, a man approached Gathungu and told Gathungu he belonged to a group that could help fund Kamucii. Gathungu did not know the name of the group to which the man belonged. Gathungu eventually agreed to join the group because he thought the group could help him start businesses. Gathungu may also have been sympathetic to what he initially perceived as the group's political opposition to the government in power at the time.

As part of his initiation into the group, the group sent Gathungu to a training camp for several days to be instructed in the group's secret codes and use of traditional weapons. The group required him to swear an oath to never leave the group. Because the group placed great emphasis on secrecy, he did not tell his wife about joining the group. Sometime after Gathungu was initiated, he learned the group was the Mungiki. The Mungiki subsequently ordered Gathungu to recruit new members.

Around the beginning of 1998, Gathungu began to doubt the wisdom of his Mungiki membership. He had discovered the Mungiki were involved in criminal activities and had also changed their political stance toward the government. He began traveling more often to make it difficult for his Mungiki superiors to find him and began giving them names of fake recruits. One of his Mungiki friends was

murdered, presumably by the Mungiki, after expressing a desire to leave the Mungiki. Gathungu witnessed a group of Mungiki members attacking people with machetes near a bus station. He saw news reports of violent attacks by Mungiki members and incidents where Mungiki members had publicly stripped women because they believed the women were dressed too provocatively. The Mungiki also strongly advocated female genital mutilation ("FGM"), which both Gathungu and Mugo oppose. Neither Mugo nor the couple's daughters have undergone FGM.

After Gathungu had been avoiding the Mungiki and supplying false recruit names for some time, the Mungiki began ordering him to visit Nairobi and calling frequently to check up on him. He worried the Mungiki doubted his loyalty to the group. One day, the Mungiki summoned him to a small house in the mountains. There, men questioned Gathungu and accused him of wanting to leave the Mungiki. Gathungu denied wanting to leave. The men gave him hallucinogenic drugs, beat him, and hung him upside down over a fire, causing him to lose consciousness several times. Gathungu continued to deny any desire to leave the Mungiki, and the men eventually released him. Gathungu showed the IJ scars encircling his legs, which were the results of the tight ropes the Mungiki used to hang him over the fire. The Mungiki warned him not to report the torture to the police and not to seek medical treatment.

Gathungu lived in fear of further torture by the Mungiki. In late 1998 and 1999 he began making plans to leave Kenya; however, he did not have enough money to bring his family with him if he left. In 2001, a friend of Mugo's invited Mugo to visit her in the United States. Gathungu insisted he and the couple's two daughters accompany Mugo on the visit. Once the family arrived in the United States, Gathungu told Mugo they could not return to Kenya. Mugo did not know of his involvement with the Mungiki until after they arrived in the United States.

Gathungu filed a claim for asylum in late 2001; at that time, Mugo and the couple's daughters filed derivative claims based on his persecution and on their own fears of forced FGM by the Mungiki if they returned to Kenya. In addition to his fear of the Mungiki, Gathungu feared the Kenyan government might persecute him on the basis of his past Mungiki membership.[1] The Kenyan government banned the Mungiki in 2002.

A. First Hearing Before the IJ

Gathungu and Mugo both testified before the IJ. Mugo testified that, when they lived in Kenya, Gathungu often took business trips, varying from one day to longer than a week. She recalled Gathungu once returned home from a trip with wounds on his legs, and he told her he had been injured in an accident. She could not remember the date of that particular trip. She testified that she did not know of her husband's involvement with the Mungiki until after they arrived in the United States. She also testified that both she and Gathungu oppose FGM and that neither she nor their daughters had undergone FGM. She testified that she feared the Mungiki based on the torture of Gathungu and the Mungiki's support of FGM.

The IJ questioned Gathungu regarding the dates and length of his torture by the Mungiki, noting Gathungu had claimed to be held for a month on a red-lined asylum application but testified to being held only a few days. Gathungu explained "the one month referred to when the Mungiki were following him." Gathungu also testified that no Mungiki member had inquired of Gathungu whether his wife and daughters had undergone FGM. Gathungu testified that he and his wife were against FGM and that neither his wife nor their two daughters had undergone FGM.

---

[1] In addition to unlawful detentions of suspected Mungiki members, the Kenyan government has been accused of extrajudicial killings of suspected Mungiki members.

Additionally, petitioners offered the expert testimony of Dr. Marsha Freeman. Dr. Freeman was the director of the International Women's Rights Action Watch, had worked on and studied women's rights in legal systems in sub-Saharan Africa, and had worked on reviews of the Kenyan police. Dr. Freeman testified that in her opinion Gathungu would be in danger of persecution or death if he returned to Kenya. She testified that Mugo and their daughters would be in danger of being kidnapped and forcibly subjected to FGM by the Mungiki. She testified that although many Mungiki activities were violent, it was a large organization, and she believed it was reasonable that some members joined simply to express their political beliefs and were not involved in violent activities. Although Dr. Freeman studied legal systems in sub-Saharan Africa and the Kenyan police force specifically, she testified she had not known anything about the Mungiki before being asked to testify. She testified that the Kenyan police force was widely corrupt. Finally, petitioners submitted a large documentary record of reports and news stories detailing the targeting of Mungiki defectors and the government's inability or unwillingness to stop violence perpetrated by Mungiki members.

On April 25, 2007, the IJ denied Gathungu's claims and his family's derivative claims ("the IJ's first decision") based both on adverse credibility findings and on the merits. The IJ found Gathungu not credible because of the inconsistencies between his red-lined asylum application and his testimony regarding the dates and the length of his torture by the Mungiki. She also found it unlikely Gathungu could be a member of the Mungiki and yet have a wife and daughters not subjected to FGM. She also doubted the Mungiki would have continued to accept Gathungu's false reports of new recruits' names after his torture. She noted Gathungu had presented no corroborating evidence of his Mungiki membership. The IJ found Mugo generally credible, but noted that most of Mugo's probative testimony—Mugo's testimony regarding the torture of her husband and the threat of the Mungiki—was based on what Gathungu had told Mugo, not on Mugo's first-hand knowledge. Although the

IJ found Dr. Freeman generally credible, she ruled Dr. Freeman did not qualify as an expert because Dr. Freeman had no specialized knowledge of the Mungiki.

Although the IJ held Gathungu's claims failed as a result of the adverse credibility finding, the IJ also denied all claims on the merits. She held that Gathungu had failed to show he was a member of a "particular social group" subject to persecution, failed to show the Mungiki persecuted him "because of" a political opinion, and failed to show a well-founded fear of future persecution. She described Gathungu as "a member of a banned criminal organization, and the Kenyan government may prosecute those who violate its legitimate criminal laws."[2]

Petitioners appealed to the BIA, and on December 3, 2008, the BIA denied their appeal ("the BIA's first opinion"). The BIA expressly declined to evaluate the IJ's credibility findings. Instead, the BIA concluded Gathungu was "unable to demonstrate the requisite social visibility such that others would be able to identify members as part of a group comprised of Mungiki defectors." Further, the BIA continued, it was "not convinced by the [petitioners]' assertion that any mistreatment is on account of [Gathungu]'s political opinion or dissent from the Mungiki." The BIA agreed with the IJ that petitioners "were unable to establish that the Kenyan government is unwilling or unable to control the Mungiki." The BIA also approved the IJ's decision to reject Dr. Freeman's proffered expert testimony. Finally, the BIA rejected the derivative claims of Mugo and the couple's daughters.

Petitioners then submitted a petition for review to the Eighth Circuit. In August 2009, before the appeal was heard, U.S. Immigrations and Customs Enforcement ("ICE") detained Gathungu for deportation. Upon petitioners'

---

[2] Both the IJ and the BIA referred to the Mungiki as a criminal syndicate or organization. Notably, however, the Kenyan government did not ban the Mungiki until sometime after Gathungu left the group.

emergency motion for stay in the U.S. Supreme Court, the Office of the Solicitor General agreed not to remove petitioners pending their Eighth Circuit appeal, and ICE released Gathungu.

B. Second Hearing Before the IJ

Following the Solicitor General's agreement not to remove petitioners pending their appeal, the BIA reopened proceedings, largely to allow petitioners to present new evidence from Gathungu's sister, Terry Wanjiku.[3] After Gathungu was detained in August 2009, Mugo called Wanjiku to tell her Gathungu was being sent back to Kenya. Until that call, petitioners had not contacted Wanjiku since they had left Kenya, fearing knowledge of their whereabouts would endanger relatives still in Kenya. Mugo told Wanjiku that petitioners were afraid to return to Kenya because of the Mungiki. Wanjiku told Mugo that shortly after petitioners had left Kenya, the Mungiki had forced Wanjiku to undergo FGM.

Neither Wanjiku nor petitioners could afford to fly Wanjiku to the United States from Kenya to testify at the second hearing; instead, Wanjiku wrote and signed a statement detailing her ordeal. Another person witnessed Wanjiku's signature on her statement, and Wanjiku sent the signed and witnessed statement to petitioners' attorney. Wanjiku also underwent a medical examination to confirm she had been subjected to FGM and sent the resulting medical report to petitioners' attorney. In her statement, Wanjiku claimed that men identifying themselves as Mungiki members came to Wanjiku's residence shortly after petitioners left Kenya. The men demanded she tell them where Gathungu had gone; Wanjiku told them she did not know. The men left but told her they would return. Some time later, men identifying themselves as Mungiki members again came to Wanjiku's home and demanded she tell them Gathungu's whereabouts. She told them she did not know where Gathungu was. The

---

[3]In the reopened case, Mugo and the couple's daughters filed individual claims.

men then kidnaped her and forcibly subjected her to FGM, asking her several more times where Gathungu had gone. Wanjiku believed Mungiki members continued to watch her in hopes of finding Gathungu.

At the second hearing, both Mugo and Gathungu testified. During Mugo's testimony, the IJ pointed out that the date on Wanjiku's medical report was difficult to read. Mugo testified that dates are written differently in Kenya than in the United States and that the date on the medical report was likely September 2009. Gathungu identified Wanjiku's signature on her statement. Additionally, through Mugo's testimony, petitioners introduced statements from Mugo's mother, Beth Mugo. Beth Mugo was a Kenyan government official. Mugo testified that Beth Mugo had told her the Kenyan government could not control the Mungiki.

The IJ again denied all of petitioners' claims ("the IJ's second decision"). The IJ adopted her credibility findings from the IJ's first decision regarding Gathungu and again found him not credible. Noting that she had originally found Mugo credible, she ruled this time that Mugo was not credible. The IJ based her changed finding of credibility on the fact that Gathungu and Mugo "were vague in their testimony about [Wanjiku] and neither could state when the incident occurred. Additionally, the Court finds it suspicious that only after [Gathungu] was detained by immigration did this claim of forced circumcision surface." The IJ discredited Wanjiku's statement, noting that the statement was not notarized and that petitioners had not proved the statement came from Kenya. The IJ stated that the medical report did not prove when Wanjiku had been subjected to FGM, nor did it prove the Mungiki had been the perpetrators; further, the IJ stated that the report did not prove Wanjiku's examination was conducted by a doctor.

Petitioners had cited Gatimi v. Holder, 578 F.3d 611 (7th Cir. 2009), to support their claims that Mungiki defectors constituted a socially visible "particular social group." The IJ summarily dismissed Gatimi, noting that she was not bound by it and

that she did not "agree with the Seventh Circuit's views on the social visibility criterion." The IJ also again rejected petitioners' claim that the Kenyan government would be unwilling or unable to protect them from the Mungiki. The IJ cited reports that the Kenyan police "have very strong policies against the Mungiki" and concluded that the Kenyan police were willing and able to protect petitioners. Having discredited Wanjiku's evidence, the IJ found Mugo had not established a well-founded fear of future persecution. The IJ also rejected the opinions of Beth Mugo on the grounds that she did not consider Beth Mugo an expert on the Kenyan government or the Mungiki and that Beth Mugo had not testified in person or submitted an affidavit. The IJ concluded that "[e]ven if [petitioners] were credible, the Court would deny their applications on the merits." Finally, because of petitioners' "credibility issues," the IJ denied voluntary departure.

On appeal, the BIA upheld the denial of petitioners' claims on the merits ("the BIA's second opinion"). The BIA made no ruling regarding the IJ's credibility findings. The BIA found petitioners had not shown Mungiki defectors were a "particular social group" because petitioners had failed to demonstrate Mungiki defectors were "socially visible" to Kenyan society at large. The BIA held Gathungu's fear of the Mungiki arose "from an 'individualized reaction' of the criminal organization to his leaving the syndicate, not from his status or any belief that he held as a defector." The BIA also found petitioners had failed to demonstrate that the Kenyan government was unable or unwilling to protect them from the Mungiki. It cited a 2005 country report relied upon by the IJ in concluding the Kenyan government was "taking action against the Mungiki such that the violence perpetrated by the group had been reduced." Finally, the BIA dismissed the opinions of Beth Mugo.

Following the IJ's second decision, petitioners' attorney's firm had volunteered to finance Wanjiku's travel from Kenya to testify in person before the IJ, and petitioners then requested the opportunity to allow Wanjiku to testify. The BIA

characterized petitioners' request as a motion to remand. Although the BIA agreed that Wanjiku's in-person testimony constituted "new evidence," the BIA refused to remand because it held Wanjiku's testimony would not change the result. Declaring that petitioners had received a full and fair hearing, the BIA dismissed the appeal. Petitioners then sought review from this court.

II.

"To be eligible for asylum, an applicant must show that she is unable or unwilling to return to her country of origin 'because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.'" Marroquin-Ochoma v. Holder, 574 F.3d 574, 577 (8th Cir. 2009) (quoting 8 U.S.C. § 1101(a)(42)(A)). "'[P]ersecution' requires the harm applicant fears to be inflicted either by the government of a country or by persons or an organization that the government was unable or unwilling to control." Salman v. Holder, 687 F.3d 991, 994–95 (8th Cir. 2012) (citation and internal quotation marks omitted). "If an applicant proves past persecution, the applicant is entitled to a rebuttable presumption of a well-founded fear of future persecution." Flores v. Holder, 699 F.3d 998, 1003 (8th Cir. 2012).

"Withholding of removal requires an even greater showing" than asylum. Lopez-Amador v. Holder, 649 F.3d 880, 884 (8th Cir. 2011). "To qualify for withholding of removal, an applicant has the burden of showing a 'clear probability' that his life or freedom would be threatened in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion." Malonga v. Mukasey, 546 F.3d 546, 551 (8th Cir. 2008) (citation and internal quotation marks omitted). "[A] 'clear probability' of future persecution is an extreme concept that involves the infliction or threat of death, torture, or injury to one's person or freedom, on account of a protected characteristic." Constanza v.

Holder, 647 F.3d 749, 753 (8th Cir. 2011) (citation and internal quotation marks omitted).

"We review the BIA's final agency action, not alternative rulings of the IJ that were not reviewed by the BIA nor necessary to its decision." Kebede v. Gonzales, 481 F.3d 562, 564 (8th Cir. 2007). However, to the extent the BIA adopted the reasoning of the IJ, we will consider both the BIA's and IJ's opinions. Rafiyev v. Mukasey, 536 F.3d 853, 856 (8th Cir. 2008). Because the BIA did not rule on the IJ's adverse credibility findings, petitioners' credibility is not before this court. See Ibrahimi v. Holder, 566 F.3d 758, 762 n.3 (8th Cir. 2009). Whether Mungiki defectors constitute a "particular social group" is a question of law, reviewed de novo but with Chevron deference to the BIA's reasonable interpretation. Ngengwe v. Mukasey, 543 F.3d 1029, 1033 (8th Cir. 2008). Whether the Kenyan government is unwilling or unable to control the Mungiki is a question of fact. Id. at 1035. This court "treat[s] administrative findings of fact as 'conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" Lopez-Amador, 649 F.3d at 884–85 (quoting 8 U.S.C. § 1252(b)(4)(B)).

Finally, we review the denial of a motion to remand for abuse of discretion. Clifton v. Holder, 598 F.3d 486, 490 (8th Cir. 2010). "The BIA will not remand to the IJ to consider additional evidence proffered on appeal if the evidence was available and could have been presented at an earlier hearing." Berte v. Ashcroft, 396 F.3d 993, 997 (8th Cir. 2005). "Even if the evidence was previously unavailable, the BIA will remand only if the evidence is of such a nature that the [BIA] is satisfied that if proceedings before the [IJ] were reopened, with all the attendant delays, the new evidence would likely change the result in the case.'" Id. (second alteration in original) (citation and internal quotation marks omitted).

As we explain below, we hold that Mungiki defectors constitute a "particular social group" and that the record compels the conclusion that the Kenyan government

is unwilling or unable to control the Mungiki. Thus, the BIA erred in denying petitioners' claims on the merits. The only remaining grounds for denying petitioners' claims is the IJ's adverse credibility findings, which the BIA did not consider. We conclude the BIA abused its discretion in denying petitioners' motion to remand to allow Wanjiku to testify in person because Wanjiku's testimony, if credited, is likely to change the IJ's credibility findings and thus change the outcome of this case.

A. Mungiki Defectors Are Socially Visible and thus Constitute a "Particular Social Group"

We conclude the BIA misapplied the "social visibility" criterion when it ruled Mungiki defectors were not a "particular social group." The BIA defines a "'particular social group' as 'a group of persons all of whom share a common, immutable characteristic . . . that the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences.'" Gaitan v. Holder, 671 F.3d 678, 680 (8th Cir. 2012) (alteration in original) (quoting Matter of Acosta, 19 I. & N. Dec. 211, 233 (BIA 1985)). The group must "have particular and well-defined boundaries, and . . . possess a recognized level of social visibility." Id. (quoting Matter of S-E-G-, 24 I. & N. Dec. 579, 582 (BIA 2008)). Specifically, "social visibility asks 'whether the members of the group are perceived as a group by society,' such that 'these individuals suffer from a higher incidence of crime than the rest of the population.'" Id. (quoting Matter of S-E-G-, 24 I. & N. Dec. at 586–87). "The 'central' question is whether the applicant's status as a member of a particular social group is the reason for that individual's persecution." Ngengwe, 543 F.3d at 1034.[4]

---

[4] In Gaitan v. Holder, the court determined that "social visibility" was a requirement and declined to conclude that the requirement of "social visibility" was arbitrary or capricious. 671 F.3d at 681 (holding recent cases established "social visibility" as a requirement). We denied the Gaitan petitioner's motion for rehearing

Mungiki defectors are socially visible, and no reasonable fact-finder could conclude otherwise based on the record. Although members of Kenyan society might not be able to identify a Mungiki defector by sight, the record amply demonstrates Kenyan society perceives "Mungiki defectors" as a specific group targeted by the Mungiki. Numerous media reports in the record detail the targeted murders of Mungiki defectors, demonstrating that Mungiki defectors "suffer from a higher incidence of crime" at the hands of the Mungiki than Kenyans in general. By the same evidence, status as a Mungiki defector "is the reason" for their persecution. Finally, although the BIA dismissed the immutability of membership in the Mungiki on the grounds that Gathungu voluntarily chose to join the group, "shared past experiences *do* constitute an immutable characteristic because a past experience cannot be undone. . . . [For example,] the BIA [has] indicated that an individual who is targeted due to her status as a former police officer may be eligible for asylum as a member of the particular social group of former police officers." Koudriachova v. Gonzales, 490 F.3d 255, 261 (2d Cir. 2007) (emphasis added) (citing In re C-A-, 23 I. & N. Dec. 951, 958–59 (2006 BIA)). Mungiki defectors are an analogous social group with shared past experiences. Thus, applying the BIA's definition, Mungiki defectors constitute a "particular social group."

B. The Record Compels the Conclusion that the Kenyan Government Is Unable or Unwilling to Stop the Mungiki

---

en banc. Gaitan v. Holder, 683 F.3d 951 (8th Cir. 2012). Concurring in the denial, Judge Colloton suggested the Gaitan panel's holding on the requirement of social visibility was not binding on other panels. Id. at 952 (Colloton, J., concurring) ("[W]hile the panel overstated the precedential effect of our circuit precedents, the decision does not expressly hold that panel opinions must be considered binding on points that are not actually litigated."). As Judge Colloton noted, the circuits are split on the "social visibility" criterion. Id. To the extent the requirement of social visibility remains an open question in our circuit, we need not address that question today, since we hold Mungiki defectors are socially visible.

-13-

The record contains numerous articles and reports detailing the murders of defectors and even the formation of Mungiki death squads to kill defectors. Many reports suggest the Kenyan government was complicit in various attacks by Mungiki members, ignoring the attacks altogether or making a show of arresting the Mungiki members but then releasing them. Reports also suggest that the Kenyan police force is widely corrupt and that some police and government officials were either bribed to ignore attacks perpetrated by Mungiki members or were Mungiki members themselves. The record contains news stories expressing outrage at the inability of the Kenyan police to stop the Mungiki; in fact, one news story notes a group of Mungiki defectors organized a protest against the government's inability to protect them.

We are not alone in concluding the Kenyan government is unable or unwilling to stop the Mungiki's violent attacks on defectors. In Wanjiru v. Holder, a Mungiki defector sought asylum. 705 F.3d 258, 260 (7th Cir. 2013). The Seventh Circuit concluded:

> [The BIA] did not confront one of Wanjiru's principal points, namely, that the Kenyan police are two-faced in this respect. Thousands of Mungiki have been shot summarily by police death squads, while at the same time, corrupt government officials have abetted and even directed the Mungiki. The International Criminal Court in the Hague confirmed charges (a step similar to finding probable cause) against Kenya's former Deputy Finance Minister and its former Deputy Prime Minister for allegedly using the Mungiki to murder and rape thousands of Kenyans in the wake of a disputed presidential election in late 2007 and early 2008. This supporting material cannot be brushed away as the product of Wanjiru's imagination. . . .
>
> [B]oth the documentary evidence and Wanjiru's testimony. . . support the conclusion that the Mungiki will probably murder Wanjiru with the acquiescence of Kenyan government officials, if he is returned.

-14-

Id. at 267 (internal citation omitted). Additionally, in Gatimi v. Holder, the court noted "[t]he evidence of the Kenyan government's complicity in the actions of the Mungiki is compelling, yet was ignored by the [BIA]." 578 F.3d 611, 617 (7th Cir. 2009) (citing, e.g., Juma Kwayera, "Gang Infiltrates Kenya Police," Mail & Guardian Online (Feb. 5, 2008), http://mg.co.za/article/2008-02-02-gang-infiltrates-kenya-police ("growing fears" that the Kenyan police force has been "infiltrated by the outlawed pro-government Mungiki sect"); Thilo Thielke, "Massacre in Kenya: Some Kill with Machetes, Others with Arrows," Spiegel Online (Jan. 28, 2008), http://www.spiegel.de/international/world/massacre-in-kenya-some-kill-with-machetes-others-with-arrows-a-531484.html (the Mungiki are "acting in collusion with the government")). Based on the similar evidence in the record before us, we find the analysis of the Wanjiru and Gatimi courts persuasive.

While the IJ correctly noted that Kenyan government officials have promised to crack down on violence perpetrated by the Mungiki, the record shows that many of the crackdown promises are hollow. Moreover, the very fact that the Mungiki have continued to create significant violence over the last decade *despite* repeated assertions by the Kenyan government that it is cracking down on the Mungiki and *despite* repeated announcements by the government that it has arrested large numbers of Mungiki members show the Kenyan government is unable to control the Mungiki. See Sarhan v. Holder, 658 F.3d 649, 660 (7th Cir. 2011) ("Attempted reform, like a bill that fails to become law, does not count as concrete government action."). Evaluating the record before us, we find the Wanjiru court's description of the Kenyan government's relationship to the Mungiki—that the Kenyan police are "two-faced in this respect," sometimes engaging Mungiki for the purpose of creating violence, other times denouncing the Mungiki as a outlawed gang, and still other times killing Mungiki members outright—apt. 705 F.3d at 266. The record compels the conclusion that the Kenyan government is unable or unwilling to control the Mungiki.

C. The BIA Abused Its Discretion in Refusing to Remand to Allow Wanjiku to Testify in Person

The BIA concluded Wanjiku's in-person evidence constituted "new evidence," and the government does not dispute that conclusion. Thus, in evaluating whether the BIA abused its discretion when it refused to remand to allow Wanjiku to testify in person, the only contested issue is whether Wanjiku's in-person testimony would likely change the result in this case. We hold that it would.

Because our decision reverses the BIA's determination that petitioners could not state a legal claim for relief regardless of credibility, the IJ's credibility findings will be crucial on remand. The IJ's adverse credibility finding as to Gathungu appears to be based in large part on Gathungu's inability to corroborate his claims of Mungiki membership and fear of future persecution, coupled with confusion over the dates and length of his torture by the Mungiki. Wanjiku's testimony would corroborate Gathungu's Mungiki membership and support Gathungu's fear that the Mungiki will harm him if he returns to Kenya, thus supporting his fear of future persecution. Additionally, Wanjiku's testimony would clearly corroborate petitioners' claim that Mugo and the couple's daughters would be in danger of forced FGM if petitioners return to Kenya, thus supporting their fears of future persecution. Wanjiku's testimony is very significant, and we believe her evidence, if credited by the IJ, would likely change the result in this case. Therefore, we conclude the BIA's denial of petitioners' motion to remand was an abuse of discretion.[5]

---

[5] Because we conclude the BIA abused its discretion by denying petitioners' motion to remand, we do not address petitioners' arguments regarding fundamental fairness.

-16-

## III.

We grant the petition for review and remand for further proceedings consistent with this opinion.

_____