# United States Court of Appeals
## For the First Circuit

No. 05-1272

MARIE CHAHID HAYEK,

Petitioner,

v.

ALBERTO GONZALES, ATTORNEY GENERAL
OF THE UNITED STATES,

Respondent.

ON PETITION FOR REVIEW OF AN ORDER
OF THE BOARD OF IMMIGRATION APPEALS

Before

Lynch, Circuit Judge,

Stahl, Senior Circuit Judge,

Lipez, Circuit Judge.

Saher Joseph Macarius on brief for petitioner.
Lyle D. Jentzer, Trial Attorney, Office of Immigration Litigation, United States Department of Justice, with whom Peter D. Keisler, Assistant Attorney General, Civil Division, and Douglas E. Ginsburg, Senior Litigation Counsel, on brief for respondent.

April 14, 2006

**Per curiam**.  Petitioner Marie Chahid Hayek, a native and citizen of Lebanon, seeks review of the decision of the Board of Immigration Appeals ("BIA") pretermitting her application for asylum as time-barred and denying her applications for withholding of removal and relief under the Convention Against Torture ("CAT") because she did not meet her burden of proof.  Hayek argues that she is eligible for asylum based on the "changed circumstances" exception to the filing deadline and that she has provided credible testimony and corroborative evidence compelling a reasonable factfinder to conclude that she is entitled to withholding of removal and CAT relief.  Because we lack jurisdiction to consider her argument about the timeliness of her asylum application, and because we reject the remainder of her arguments, we deny Hayek's petition for review.

## I.

On September 2, 1992, Hayek entered the United States as a visitor, with authorization to remain for a temporary period not to exceed one month.  Eleven days after her arrival, she married her fiancé, a Lebanese citizen who had arrived in the United States three years before and overstayed.  They both remained illegally in the United States and later had two children, both of whom are United States citizens.  In 2000, Hayek's husband was deported to Lebanon.

On February 4, 2002, the Immigration and Naturalization Service ("INS") served Hayek with a notice to appear, charging her with being subject to removal for remaining in the United States without authorization, pursuant to 8 U.S.C. § 1227(a)(1)(B). At a hearing before an immigration judge ("IJ"), Hayek conceded removability, but applied for asylum, withholding of removal, CAT relief, and, in the alternative, voluntary departure. We summarize the evidence that Hayek provided in support of her claims and discuss the decisions of the IJ and the BIA.

## A. Evidence before the IJ and BIA

In support of her application for asylum, withholding of removal, and CAT relief, Hayek testified that she experienced a series of threats and physical attacks while she was involved with the Lebanese Forces, a Christian military and political group opposed to the presence of Syrian forces in Lebanon. Hayek, a Maronite Christian, joined the Lebanese Forces in 1982 and eventually became responsible for various administrative activities of the Lebanese Forces' political party and student group.

The violent incidents began in early 1992, when Hayek was participating in a political demonstration for the Lebanese Forces party in Lebanon. Syrian and Lebanese soldiers hit and kicked the demonstrators. Hayek, who was standing near the front of the demonstration, was beaten with the soldiers' rifles. Two days later, four soldiers came to her house. Hayek's mother helped

-3-

Hayek leave the house through the back door, and Hayek hid in a farmhouse in the mountains for several days.

Approximately a month later in March 1992, when Hayek was out of hiding and visiting a sick relative, two armed men in civilian clothing stopped her as she was entering her car, calling her "Officer Marie" and telling her, "you Christians, your days are over." One of the men grabbed her by the neck and ripped up a picture of a saint that she had placed in the dashboard of the car. After the men left, Hayek again went into hiding for a month and a half.

A few months later, when Hayek was leaving a party at the local university with some friends, Syrian men forced their vehicle off the road and pulled the passengers out of the car. One of the men, addressed by the others as "Corporal," grabbed Hayek by the hair, forcibly kissed her, and attempted to rape her. Hayek escaped and flagged down a passing car, fleeing to her sister's house, where she received treatment from a doctor.

Approximately four weeks later, Syrian intelligence forces approached Hayek and her siblings at a local store. The men questioned Hayek's brother about his identity. They did not recognize Hayek but stated that they were looking for her.

Two weeks later, Hayek fled Lebanon. Using a visa that a friend in the United States helped her to obtain, Hayek arrived in the United States in September 1992. She stayed at the home of

her sister, where her fiancé -- a former member of the Lebanese Forces who had arrived in the United States three years earlier -- had also been staying. She married her fiancé approximately eleven days later.

When asked why she failed to apply for asylum upon her arrival or at any time prior to the removal proceedings, Hayek explained, "I was very scared . . . because I know what's going to happen to me if I went back there." Hayek holds a college degree. When asked if she had any further contact with the Lebanese Forces, Hayek stated that she ended her participation in their activities when she left the country. However, she explained that, in 2001, she had called her uncle, a member of the Lebanese Forces with whom Hayek had worked closely. He warned her not to come back because Syrian intelligence forces had detained and tortured him and other Lebanese Forces members and still sought to question Hayek. Hayek did not submit an affidavit from this uncle confirming the conversation. Hayek noted in her affidavit that the police had come to her home in Lebanon to arrest her on three occasions in 1996 and 1999.

Along with her testimony, Hayek submitted additional evidence in support of her claims. She presented two witnesses. Fares Hayek, Hayek's brother-in-law, testified that he knew Hayek in Lebanon and that they were both members of the Lebanese Forces. Khalil Hayek, Hayek's husband's cousin, stated that he was a clerk

who did paperwork for the Lebanese Forces and that he knew Hayek when they were both members of the group. Neither affiant testified to the attacks that Hayek claimed to have suffered.

Hayek also submitted written statements from various individuals in Lebanon. Archbishop Bechara Rahi, head of the Maronite Archbishopric in Jbeil, Lebanon, stated that Hayek is a member of the Lebanese Forces Party; that she was forced to leave Lebanon due to the political and security situation in that country; and that "the current situation in the country still prevents her from returning," but provided no specific facts. Eli Maroun Zagib, a selectman of the town of Amsheat, Lebanon, stated that Hayek is wanted by the police "for her belonging to the party of the Lebanese forces," but also provided no details.

Perhaps the most helpful written statement was from Dr. Antoine B. Issa, who stated that he treated Hayek for bruises caused by a physical attack in 1992, but provided no details as to the attack or treatment. Fouad Malik, Commander of the Lebanese Forces, stated that Hayek was a member of the Lebanese Forces from 1982 until 1989. This, as the government points out, is inconsistent with Hayek's own testimony that she was an active member until 1992, when she said the persecution began.

Hayek also submitted country conditions reports, including the State Department 2002 and 1999 Country Reports on Lebanon, the Amnesty International 1999 Annual Report on Lebanon,

several Human Rights Watch documents, and various reports and articles discussing Syrian involvement in Lebanon and the treatment of anti-Syrian demonstrators and protestors.

## B.   The IJ and BIA Decisions

After a hearing on the merits, the IJ pretermitted Hayek's request for asylum on the ground that it was untimely filed under 8 U.S.C. § 1158(a)(2)(B), which states that an applicant for asylum should file an application within one year of his or her arrival in the United States.  The IJ concluded that no changed or extraordinary circumstances exist to justify an exception to the one-year deadline.

The IJ also denied Hayek's application for withholding of removal and CAT protection.  Although he did not explicitly make a lack of credibility finding, the IJ found that she had not, through her testimony, met her burden, and expressed doubts about the truthfulness of her testimony.  The IJ found that the petitioner's marriage to her fiancé eleven days after they were reunited "casts doubt upon the veracity of her story."  He rejected her claim that she came to the United States to avoid persecution.  He found it "more likely that the respondent arranged to come to the United States to marry her fiancé."  He also noted the fact that the petitioner had never previously applied for political asylum, stating that "[i]n the ordinary case . . . an individual would arrive in this country and within a year after their arrival would,

-7-

if they were genuine, submit an application for asylum during a period of time when certain facts might be able to be substantiated." He found her explanation of her reasons for not applying for asylum (that she was scared to go to the Immigration Service) to be "disingenuous at best."

The IJ characterized Hayek's testimony as "general and meager" and said her testimony was "more in the nature of a cliche." Hayek had asserted that there were identified people who had firsthand knowledge of her persecution and were still in contact with her, but she had failed to provide corroborating statements from those individuals. As a result, the IJ found her testimony about the events that took place some eleven years earlier "unsubstantiated and unsupported." The IJ did not comment specifically on the items of corroborative evidence that she had submitted or on her testimony that an uncle had warned her in 2001 not to return. He concluded that Hayek had failed to provide him with the necessary evidence to establish whether the events she testified to had ever occurred, and that his sense of the matter was "that these events did not occur."

The IJ also noted that the documentary evidence went against her claim that she would be persecuted if she returned to Lebanon, in two respects: there was no evidence that Syrian forces or Lebanese forces were persecuting Christians and there was no basis to think that events eleven years before would lead them to

harm her. The IJ concluded that "it is not more likely than not that she would be persecuted if she returns to Lebanon, and certainly it does not appear . . . to be more likely than not that she would be tortured if she returns to that country." He did find Hayek eligible for voluntary departure, noting that she has two United States citizen children and no criminal record.

Hayek appealed the IJ's decision to the BIA. In her appeal, she argued that the IJ erred by not finding that the warning that Hayek received from her uncle in 2001 was evidence of "changed circumstances" justifying the filing of her asylum application past the one-year deadline. She also challenged the IJ's denial of her withholding of removal and CAT claims based on the lack of corroborative evidence, arguing that she did provide supporting evidence of her claims (the testimony of her relatives and the written statements) and that her "inability to obtain physical evidence" should not be fatal to her application. In addition, Hayek submitted the testimony of the leader of her church in the United States as "new evidence" indicating that her marriage was not planned, and therefore, she argued, not the reason for her arrival in the United States.[1] Hayek also argued that the IJ

_____

[1]Hayek submitted a letter from Msgr. Joseph Lahoud, of Our Lady of the Cedars of Lebanon Church, who performed her marriage ceremony. Msgr. Lahoud stated that the "circumstances that surrounded [Hayek's] marriage were unusual and were of concern to me," but "because of cultural difficulties the couple were facing, it became understandable." He noted that both Hayek and her fiancé were staying with Hayek's sister, and, since they were unmarried,

improperly concluded that the background documentary evidence of record does not reflect that Syrian or Lebanese forces are currently persecuting Christians.

The BIA issued a short opinion affirming and adopting the IJ's decision. The BIA specifically stated that "we agree that the respondent did not present reasons for failing to file her application for asylum within one year of arrival in the United States that rise to the level of extraordinary circumstances, nor did the respondent present evidence of changed circumstances that materially affects her eligibility for asylum." In responding to Hayek's argument that the IJ failed to consider her corroborating evidence, the BIA stated that "the evidence to which she refers . . . would not change the outcome in these proceedings." The BIA also stated that the "country conditions information . . . also does not change the outcome here." The BIA concluded that Hayek "did not demonstrate that she experienced past persecution or torture, or that she has a well-founded fear of future persecution in Lebanon. She further has not shown that it is more likely than not that she would suffer future persecution or torture upon return to her homeland."

---

"[t]his arrangement was foreign to the Lebanese tradition, culture and more so to the Maronite religion." Msgr. Lahoud stated that he "realized that this sudden marriage took place almost without preparation" and noted that "no invitations were sent, no parents were in sight, nor did they have a wedding celebration."

On appeal, Hayek raises two main arguments. First, she argues that she has established "changed circumstances" justifying an exception to the one-year asylum filing deadline. Second, she argues that she met her burden of proof for her withholding of removal and CAT claims. Specifically, she challenges the IJ's failure to credit her testimony as establishing past persecution and argues that the IJ erred in not considering her corroborative evidence.

In addressing these arguments, we review the decision of the BIA directly, but "[w]here the BIA deferred to or adopted the IJ's reasons for denying [the petitioner's] claims, we review those portions of the IJ's decision as part of the final decision of the BIA." Hernandez-Barrera v. Ashcroft, 373 F.3d 9, 20 (1st Cir. 2004). We conclude that we lack jurisdiction to consider Hayek's argument about the timeliness of her asylum application, and our review of the record regarding Hayek's withholding of removal and CAT relief claims does not compel us to reject the findings of the BIA.

## A. Timeliness of Hayek's Asylum Application

The government correctly argues that we have no jurisdiction to review the BIA's decision that Hayek's application for asylum was untimely and that the untimeliness was not excused. See 8 U.S.C. § 1158(a)(3) ("No court shall have jurisdiction to

review any determination of the Attorney General under [8 U.S.C. § 1158(a)(2), describing the one-year deadline for asylum applications and exceptions.]").

This conclusion is unchanged by section 106(a) of the REAL ID Act, which provides that "[n]othing in subparagraph (B) or (C), or in any other provision of this chapter (other than this section) which limits or eliminates judicial review, shall be construed as precluding review of constitutional claims or questions of law raised upon a petition for review." REAL ID Act of 2005, Pub. L. No. 109-13, § 106(a)(1)(A)(iii), 119 Stat. 231 (codified at 8 U.S.C. § 1252(a)(2)(D)). In Mehilli v. Gonzales, 433 F.3d 86, (1st Cir. 2005), we explained that "[u]nder the terms of this limited jurisdictional grant, discretionary or factual determinations continue to fall outside the jurisdiction of the courts of appeals, and BIA findings as to timeliness and changed circumstances are usually factual determinations." Id. at 93 (citations and internal quotation marks omitted). We lack jurisdiction to consider this matter.

**B. Withholding of Removal and CAT Claims**

We have jurisdiction over Hayek's claims for withholding of removal and CAT relief. See Sharari v. Gonzales, 407 F.3d 467, 474 (1st Cir. 2005). In assessing these claims, we will "uphold the BIA's determination if it is supported by reasonable, substantial, and probative evidence on the record considered as a

-12-

whole." Hernandez-Barrera v. Ashcroft, 373 F.3d 9, 20 (1st Cir. 2004) (citation and internal quotation marks omitted). "Under the highly deferential substantial evidence standard, we must uphold the BIA's findings unless any reasonable adjudicator would be compelled to conclude to the contrary." Gi Kuan Tai v. Gonzales, 423 F.3d 1, 4 (1st Cir. 2005) (citation and internal quotation marks omitted).

An applicant for withholding of removal must "show either that (i) he has suffered past persecution on account of [race, religion, nationality, membership in a particular social group, or political opinion] (thus creating a rebuttable presumption that he may suffer future persecution), or (ii) it is more likely than not that he will be persecuted on account of a protected ground upon his return to his native land." Da Silva v. Ashcroft, 394 F.3d 1, 4 (1st Cir. 2005) (citing 8 C.F.R. § 208.16(b)). This is a more rigorous standard than the standard for asylum. An applicant for CAT relief "must bear the burden to prove, by objective evidence, that it is more likely than not that he will be tortured if he is deported." Elien v. Ashcroft, 364 F.3d 392, 398 (1st Cir. 2004) (emphasis omitted) (citing 8 C.F.R. § 208.16(c)(2)). Under the standards for both withholding of removal and CAT relief, "[t]he testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration." 8 C.F.R. § 208.16(b),(c)(2).

Hayek argues that some of the IJ's stated reasons for doubting her story -- her quick marriage to her fiancé and her failure to file a timely asylum application -- are misplaced. However, Hayek's testimony was general, meager, and often vague. She failed to testify in detail or corroborate her story. Under the circumstances of this case, and given her admitted contact with sources who could have corroborated her story if it were true, the IJ was justified in concluding that Hayek failed to meet her burden of proof.

While Hayek could have helped herself by producing specific corroborative testimony pertinent to the issues and supporting her claims, she did not do so. This case does not involve a question of whether corroborative evidence was unavailable to the petitioner. She is the one who said in her asylum application that her family had firsthand knowledge of the persecution. But she produced no such evidence. We explain a bit further.

Hayek provided no evidence corroborating her participation with the Lebanese Forces party in 1992, the demonstration at which soldiers beat her, or the threats and questioning by Lebanese and Syrian soldiers that her mother, siblings, and friends witnessed. Given Hayek's contact with relatives and colleagues in Lebanon, it would be reasonable to expect some corroboration of the 1992 incidents from these

individuals.  She provides no explanation for the absence of these documents.

Instead, Hayek argues that she did submit some corroborative evidence and that this evidence does sustain her burden of proof.  Hayek submitted several documents.  However, none of the witnesses who testified or documents she submitted corroborate her testimony that she was a member of the Lebanese Forces in 1992, when the attacks and threats against her allegedly began.  In fact, the letter from Fouad Malik, Commander of the Lebanese Forces, states that Hayek "was part of the Lebanese administrative forces since 1982 until 1989."  While there may be an explanation for why this date does not coincide with Hayek's testimony, Hayek offers none.

Also troubling is Hayek's failure to produce any documents from her mother, siblings, or friends who, according to Hayek's testimony, have first-hand knowledge of the threats that are the basis of her claim of past persecution.  For example, the IJ heard testimony from Hayek regarding her mother's and siblings' encounters with Lebanese and Syrian soldiers who questioned them about Hayek's whereabouts, yet Hayek produced no letters from her relatives to corroborate that testimony.  We recognize that a person's ability to obtain corroborating evidence from family members or others in their native country "often depend[s] on the social and political circumstances of a given country."  Abdulai v.

-15-

Ashcroft, 239 F.3d 542, 555 n.9 (3rd Cir. 2001). However, in this case, Hayek testified that she has been in contact with her relatives in Lebanon and that her parents and siblings in Lebanon were not members of the Lebanese Forces and had not been arrested or harassed by anyone.

The letter from Dr. Issa stating only that he treated Hayek for bruises suffered from a physical attack in 1992 is not enough. Hayek does not present the necessary corroborative evidence to meet her burden of proof. See Diab v. Ashcroft, 397 F.3d 35, 40 (1st Cir. 2005) (noting that a doctor's letter describing scars from an attack would not establish that petitioner was attacked on the basis of his religion).

Because Hayek has failed to show past persecution, we turn to the issues of whether Hayek has established her burdens as to future persecution or torture. Having failed to establish past persecution, Hayek is not entitled to a presumption of future persecution. Palma-Mazariegos v. Gonzales, 428 F.3d 30, 35 (1st Cir. 2005). She bears the burden of proving that it is more likely than not that she will be persecuted or tortured based on a statutorily protected ground if she is deported to Lebanon. Da Silva, 394 F.3d at 4. Hayek argues that Lebanese and Syrian forces will persecute and torture her because she is a Maronite Christian and a former member of the Lebanese Forces. However, the IJ found that "to the extent that the respondent has any likelihood of harm

occurring to her, the events to which she has testified took place more than 11 years ago" and current country conditions reports did not support her claims of widespread persecution and torture of Maronite Christians or former Lebanese Forces members. Substantial evidence supports this finding. Hayek has not participated in any activities with the Lebanese Forces since 1992, and her parents and siblings have lived in Lebanon unharmed since that time. We are not compelled, on this record, to conclude that Hayek has demonstrated that it is more likely than not that she would now be persecuted or tortured by Lebanese or Syrian forces upon her deportation to Lebanon.

Lacking jurisdiction over Hayek's timeliness claim and finding no error compelling us to reject any of the other findings by the IJ or BIA, we <u>affirm</u> the decision and <u>deny</u> the petition for review.

<u>So ordered</u>.