# United States Court of Appeals
## For the First Circuit

No. 12-1485

ELISABETE COSTA,

Petitioner,

v.

ERIC H. HOLDER., JR., Attorney General,

Respondent.

PETITION FOR REVIEW FROM AN ORDER OF THE
BOARD OF IMMIGRATION APPEALS

Before

Howard, Selya and Thompson,
<u>Circuit Judges</u>.

<u>William E. Graves</u> and <u>Graves & Doyle</u> on brief for petitioner.
<u>Stuart F. Delery</u>, Acting Assistant Attorney General, <u>M. Jocelyn Lopez Wright</u>, Senior Litigation Counsel, Office of Immigration Litigation, and <u>Melissa K. Lott</u>, Trial Attorney, Office of Immigration Litigation, on brief for respondent

October 4, 2013

**HOWARD, Circuit Judge**. Elisabete Costa, a Brazilian citizen, petitions for review of the Board of Immigration Appeals' ("BIA") order affirming her removal to Brazil. Costa entered the United States illegally in 2003. Thereafter, she began working with Immigration and Customs Enforcement ("ICE") agents to identify sellers of fraudulent immigration documents. Because of her work, she faced harassment in the United States and reported threats back home in Brazil. Eventually, the harassment led Costa to stop assisting ICE. The government then reinstated a prior removal order against her. She sought withholding of removal and relief under the United Nations Convention Against Torture, claiming that she faced persecution and torture in Brazil because of her work with ICE. The Immigration Judge ("IJ") denied both applications, and the BIA affirmed. On review of the record before us, we deny Costa's petition.

## I.

Costa first attempted to enter the United States in early 2003 from Mexico. She was apprehended and removed that May, but four months later she successfully entered the United States without inspection and settled in the Boston area. In 2005 Costa learned from her sisters, who were also living in the United States, that ICE was looking for informants to help identify sellers of fraudulent immigration documents. Costa voluntarily went to ICE and began working as an informant for the agency.

According to her testimony, in exchange for her work Costa received assurances that she could remain in the United States and eventually obtain lawful status. In addition, ICE allegedly stated that it would help her children, who had joined her in the United States to procure legal documentation.

In her role as an informant, Costa would receive the name and telephone number of an individual suspected of selling illegal documents. She would arrange to purchase these documents from the seller, sometimes using a fake name, other times using her real name. Although ICE provided her with a telephone, at times she used her personal phone to communicate with sellers. Whenever she went to meet a seller, ICE would videotape or record the transaction. Among other operations, Costa assisted in a sting that led to the arrest of an individual identified as "Lelito," from whom Costa had previously purchased documents. During Lelito's arrest, Costa was present but was neither handcuffed nor detained.

After Lelito's arrest, Costa began receiving threatening phone calls in July and August of 2008. Based on the telephone numbers appearing on her cell phone display, she believed that some of these calls came from Brazil. These callers told Costa that she would be killed upon her return to Brazil and insulted her for turning in "her own people" to ICE. Costa and her then-fiancé

moved to new apartments three times and changed their telephone numbers as a result of the harassing calls.[1]

Costa's mother, who lives in Brazil, also received phone calls making similar threats against Costa. In addition, Costa's mother told her that two Brazilian police officers, one of whom identified himself as Lelito's brother, visited her home and told her that they would find Costa if she returned to Brazil. They also instructed her to inform the police when Costa was back in Brazil. When Costa's female cousin returned to Brazil, Lelito's brother, accompanied by a different police officer, visited Costa's mother again to determine whether it was actually Costa who had returned to Brazil. Costa's sisters also began receiving threats based on their cooperation with ICE, including a call from one anonymous caller who said that the sisters would be unprotected in Brazil.

According to Costa, fears about these phone calls and visits led her to avoid ICE agents, who she says became angry with her for not assisting them. In September 2008, they asked her to meet with them at their office, whereupon they arrested her and informed her that they would reinstate a prior removal order. While reinstatement of a prior removal order generally precludes

---

[1] At some point during this period Costa got into an altercation with a woman in a restaurant, who accused Costa of being a "rat" and a "bitch." Costa recognized this woman as the girlfriend of a seller of fraudulent immigration documents.

-4-

any further hearing before an IJ, there is an exception for aliens seeking withholding of removal out of fear of returning to the country of deportation. See 8 C.F.R. § 241.8(e). Costa claimed a fear of returning to Brazil due to the threats that she had received for her work with ICE. Consequently, an asylum officer transferred her case to an IJ, and Costa filed an application for withholding of removal, claiming that she would likely face persecution as a member of a particular social group, namely, "former ICE informants who have acted against Brazilian citizens resulting in their deportation." She also sought relief under the United Nations Convention Against Torture. She included declarations from her sisters and her mother, as well as a report on country conditions in Brazil.

The IJ denied both applications. He assumed that Costa faced a threat from Lelito's family if she returned to Brazil. He concluded, however, that she was not eligible for withholding of removal because the harm that she faced was limited to threats from Lelito's family and was not based on her membership in a social group. Additionally, the IJ cited Matter of C-A-, 23 I. & N. Dec. 951 (BIA 2006), to support the conclusion that a noncriminal informant -- that is, an informant who is not part of a criminal organization -- is not a member of a social group. Finally, the IJ concluded that Costa faced no fear of torture by or with the acquiescence of a government official. Instead, he reasoned that

the Brazilian police officers who visited her mother were acting in their personal capacities and not as arms of the state or with its tacit acceptance.

Costa appealed the IJ's order to the BIA, which dismissed the appeal, largely reiterating the IJ's reasoning. Like the IJ, the BIA held both that ICE informants lack the requisite social visibility to constitute a social group and that the persecution Costa faced was "on account of a personal vendetta and not on account of her membership in a particular social group." With respect to the issue of torture by or with the acquiescence of a government official, the BIA recognized that the threats came from someone "connected with the police," and that corruption existed among Brazilian police officers. Nevertheless, the BIA noted that there is a system in place for complaining about police misconduct, which has resulted in investigations and prosecutions. Thus, the BIA concluded, "the evidence does not establish it is more likely than not that she would be tortured in Brazil by or with the consent or acquiescence of a government official." Costa petitioned for review of this order.

## II.

Where, as here, the BIA "adopted and affirmed the IJ's ruling" while "discuss[ing] some of the bases for the IJ's opinion, we review both the IJ's and BIA's opinions." Weng v. Holder, 593 F.3d 66, 71 (1st Cir. 2010) (quoting Cuko v. Mukasey, 552 F.3d 32,

37 (1st Cir. 2008)) (internal quotation marks omitted).  Our review covers both the BIA's factual findings and its legal conclusions.  "We review the BIA's findings of fact under the deferential substantial evidence standard."  Scatambuli v. Holder, 558 F.3d 53, 58 (1st Cir. 2009).  We will only reverse the BIA's findings if "the record compels a contrary conclusion."  Arévalo-Girón v. Holder, 667 F.3d 79, 82 (1st Cir. 2012); see 8 U.S.C. § 1252(b)(4)(B).  We review legal questions de novo, see Mayorga-Vidal v. Holder, 675 F.3d 9, 13 (1st Cir. 2012), affording the requisite deference to the BIA's interpretations of those statutes and regulations which it administers, see Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984).  That deferential standard requires a reviewing court to determine "whether the statute is silent or ambiguous with respect to the specific issue before it; if so, the question for the court [is] whether the agency's answer is based on a permissible construction of the statute."  I.N.S. v. Aguirre-Aguirre, 526 U.S. 415, 424 (1999) (quoting Chevron, 467 U.S. at 843).

A.        Withholding of Removal

The government cannot deport an otherwise removable alien "if the Attorney General decides that the alien's life or freedom would be threatened in [the country of removal] because of the alien's race, religion, nationality, membership in a particular social group, or political opinion."  8 U.S.C. § 1231(b)(3)(A).  In

-7-

order to qualify for withholding of removal, the alien must show "a clear probability of persecution," Tay-Chan v. Holder, 699 F.3d 107, 111 (1st Cir. 2012) (quoting Morgan v. Holder, 634 F.3d 53, 60 (1st Cir. 2011)), or, in other words, that she will "more likely than not" face persecution in her homeland, Rotinsulu v. Mukasey, 515 F.3d 68, 71 (1st Cir. 2008).  In addition, the alien must show that one of the five protected grounds will be "one central reason" for the persecution.  8 U.S.C. § 1158(b)(1)(B)(i); see also id. § 1231(b)(3)(C); Beltrand-Alas v. Holder, 689 F.3d 90, 93 (1st Cir. 2012).

Costa alleged that she faced a threat of persecution based on her membership in a particular social group.  The BIA first articulated a definition of "particular social group" in Matter of Acosta, 19 I. & N. Dec. 211 (BIA 1985), overruled in part on other grounds by Matter of Mogharrabi, 19 I. & N. Dec. 439 (BIA 1987), where it classified a "social group" as "a group of persons all of whom share a common, immutable characteristic," which could include "sex, color, or kinship ties, or in some circumstances . . . a shared past experience such as former military leadership or land ownership," id. at 233.  In subsequent cases, the BIA has recognized social groups based on a variety of shared experiences. See, e.g., In re Kasinga, 21 I. & N. Dec. 357 (BIA 1996) (women from a particular tribe in Togo who resisted female genital

mutilation); In re Fuentes, 19 I. & N. Dec. 658 (BIA 1988) (former police officers in El Salvador).

The BIA also, however, has established a distinction between persecution arising out of a shared experience and persecution that is wholly personal in nature despite being related to a characteristic shared by others. The BIA has given an example of this distinction:

> Were a situation to develop in which former police officers were targeted for persecution because of the fact of having served as police officers, a former police officer could conceivably demonstrate persecution based upon membership in a particular social group of former police officers. On the other hand, if a former police officer were singled out for reprisal, not because of his status as a former police officer, but because of his role in disrupting particular criminal activity, he would not be considered, without more, to have been targeted as a member of a particular social group.

Matter of C-A-, 23 I. & N. Dec. at 958-59.

In the present case, substantial evidence supports the BIA's and IJ's finding that Costa faces a risk of harm from Lelito and his family arising solely out of a personal dispute. Although Costa participated in multiple sting operations, the record indicates that only Lelito's arrest triggered the threats that form the basis of her application for withholding of removal. Indeed, the most relevant evidence that Costa faces a risk of persecution in Brazil is that Lelito's brother twice visited her mother to threaten Costa if she returned to Brazil. There is little to suggest that the scope of persecution extends beyond a "personal

-9-

vendetta." Consequently, we cannot overturn the determination that the risk that Costa faces is personal, and not due to her membership in a social group.

We need not address the several arguments that Costa makes regarding the social visibility of former ICE informants. The BIA's and IJ's decisions rested on two independent rationales: that the persecution she faces is a personal matter; and that Costa's proposed group lacked social visibility. Having affirmed the first rationale, we do not reach the second.

B.         Convention Against Torture

Costa also contests the BIA's rejection of her claim for relief under the United Nations Convention Against Torture ("CAT"). An applicant for protection under CAT bears the burden of proving that it is more likely than not that she will be tortured if returned to her country of origin. 8 C.F.R. § 208.16(c)(2); Elien v. Ashcroft, 364 F.3d 392, 398 (1st Cir. 2004). The torture must be "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 1208.18(a)(1). Unlike withholding of removal, an applicant need not demonstrate that the risk of torture relates to a protected ground. See Romilus v. Ashcroft, 385 F.3d 1, 8 (1st Cir. 2004) ("The applicant need not prove the reason for the torture . . . .").

Both the BIA and the IJ accepted as true Costa's evidence regarding police visits to her mother's home in Brazil. According to the record evidence, two uniformed police officers, one of whom identified himself as Lelito's brother, visited her mother and asked about Costa's whereabouts. They then told her that "she needed to inform the police as soon as [Costa] returned to Brazil." After Costa's cousin had returned to Brazil, Lelito's brother again visited Costa's mother to ascertain whether it was actually Costa who had returned. He was accompanied by a different police officer. This visit occurred the day after Costa's cousin had returned to Brazil.

The BIA affirmed the IJ's conclusion that "[t]he action of two rogue police officers does not constitute government action," and both the BIA and the IJ found that "[t]he applicant did not present any specific evidence that the Brazilian government supported the individual's actions." The BIA also discussed background evidence about conditions in Brazil. While it found evidence of "a high level of police abuse and impunity," it also noted that "complaints may be made against police for criminal behavior, resulting in some investigations and prosecutions." Based on all of this evidence, the BIA found the evidence insufficient to establish it more likely than not that Costa faced torture by a state actor acting in his official capacity.

Given our deferential review of the BIA's factual findings, we have no basis for overturning this decision. Although Lelito's brother may have hoped to project an air of official authority when he visited Costa's mother, that conclusion rests on a number of unproven assumptions. All we know from the record is that he brought two separate police officers with him on these visits, and that he told Costa's mother to contact "the police" when Costa returned to Brazil. Perhaps there is a larger group of police officers willing to assist him in taking action against Costa, but that inference is not inevitable given the evidence before the BIA. Moreover, the country reports demonstrate the Brazilian government's efforts to crack down on police corruption. Even if Lelito's brother intended to harm Costa upon her return, the BIA was not required to conclude that the Brazilian government would fail to respond to complaints about abuse of police authority. The evidence is speculative no matter how we examine it. Thus, like Socrates, all we know for certain is that we don't know what will happen. The standard for overturning the BIA's factual findings requires more -- that the evidence "compel[s] a reversal of the [BIA]," Romilus, 385 F.3d at 9, and the record does not lead to that conclusion.

### III.

Petition **denied**.