Not for Publication in West's Federal Reporter

# United States Court of Appeals
## For the First Circuit

No. 18-1325

JAMES NJOGU MUHORO,

Petitioner,

v.

WILLIAM P. BARR,
UNITED STATES ATTORNEY GENERAL,*

Respondent.

PETITION FOR REVIEW OF AN ORDER OF THE
BOARD OF IMMIGRATION APPEALS

Before

Lynch, <u>Circuit Judge</u>,
Souter,** <u>Associate Justice</u>,
and Stahl, <u>Circuit Judge</u>.

<u>Jeffrey B. Rubin</u> and <u>Rubin Pomerleau PC</u> on brief for petitioner.

<u>Joseph H. Hunt</u>, Assistant Attorney General, Civil Division, <u>Emily Anne Radford</u>, Assistant Director, and <u>Aric A. Anderson</u>, Trial Attorney, Office of Immigration Litigation, on brief for respondent.

---

\* Pursuant to Fed. R. App. P. 43(c)(2), Attorney General William P. Barr has been substituted for former Attorney General Jefferson B. Sessions, III as the respondent.

\*\* Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

March 13, 2019

**STAHL**, **Circuit Judge**.   Petitioner James Njogu Muhoro seeks review of a Board of Immigration Appeals ("BIA") order denying him asylum, withholding of removal, and protection under the Convention Against Torture ("CAT").   The BIA affirmed the Immigration Judge's ("IJ") rulings that Muhoro failed to timely file his application for asylum and, separately, that he demonstrated neither the past persecution or probability of future persecution required for withholding of removal nor the likelihood of torture required for CAT-based relief.   After careful consideration, we dismiss Muhoro's claim for asylum and deny his claims for withholding of removal or relief under the CAT.

## I.

Muhoro is a native and citizen of Kenya, and a member of the Kikuyu tribe.[1]   In 1992, conflict broke out between the Kikuyu and another tribe, the Kalenjin.   According to Muhoro, when he was eighteen years old, leaders from his community brought about fifty to sixty young people to a meeting, ostensibly for the purpose of devising a defense against Kalenjin attacks.   Once there, however, the leaders revealed that the meeting's true purpose was to be an initiation ceremony for the Mungiki, a self-organized Kikuyu militant group formed to defend against Kalenjin incursions.

---

[1]   We draw the relevant facts from the IJ's written order and from the administrative record.   See Aguirre v. Holder, 728 F.3d 48, 50 (1st Cir. 2013).

- 3 -

Muhoro claims that the Mungiki representatives, armed with knives and machetes, required attendees to take part in an initiation ritual, and threatened them with death if they did not do so.

Muhoro testified that, although he participated in the initiation, on the following day, he fled his hometown rather than remain with the Mungiki. He later learned that two of his cousins who remained with the militants were killed by members of that group when they retreated from a skirmish with the Kalenjin.

For the next seven years, Muhoro lived with an aunt, whose home was roughly a five-hour drive away from his hometown. He testified that he limited his social interactions and did not return home during that time, as he feared being identified as a Mungiki "defector" and killed. He further claimed that, after he fled, unidentified persons broke into his parents' home and left notes stating "Mungiki defectors will be killed."

In 1999, Muhoro completed college in Kenya and, on June 9, 1999, entered the United States on a J-1 exchange visa, which allowed him to remain here legally until September 14, 1999. He originally attended a cultural exchange program in Texas and then travelled to Massachusetts, where Muhoro claims he consulted with immigration attorney Clark Siddiqui[2] regarding his fear of returning to Kenya. Muhoro alleges that Siddiqui told him that he

---

[2] Several different spellings of Siddiqui's name appear in the record and briefs.

would not be able to extend his visa and would need to return to Kenya unless he married a U.S. citizen. Muhoro conceded, however, that he never signed a retainer agreement or other contract formalizing an attorney-client relationship with Siddiqui.

On December 9, 2003, Muhoro married a U.S. citizen, and he subsequently used that marriage as the basis for obtaining lawful permanent resident status on February 21, 2006. Thereafter, in 2007, Muhoro traveled to Kenya for a roughly two-and-a-half week trip. While there, he claims to have stayed in a "high-security hotel" in Nairobi, which he says he rarely left because of his fear of the Mungiki.

United States law enforcement officials eventually determined that Muhoro's marriage was a sham and, on February 1, 2011, he was charged with one count of conspiracy to defraud the United States in violation of 18 U.S.C. § 371. Following his guilty plea to the charge, the district court sentenced Muhoro to two months' imprisonment.

On August 20, 2012, the Department of Homeland Security served Muhoro with a Notice to Appear, which charged him with being removable for, first, overstaying his original visa and, second, for violating or attempting or conspiring to violate 18 U.S.C. § 1546.[3] Muhoro admitted the facts alleged in the Notice and

---

[3] Section 1546 defines various offenses relating to fraud and misuse of visas, 18 U.S.C. § 1546, and aliens convicted of either

conceded removability. He initially sought only withholding of removal. However, on September 25, 2012, he applied for asylum, withholding of removal, and protection under the regulations implementing the CAT. Thereafter, the IJ granted Muhoro's motion to amend his petition to include the additional bases for relief.

On December 27, 2016, the Immigration Court in Boston held an individual hearing to address Muhoro's case. Muhoro was the only witness at that hearing, and he testified as to the facts set forth above, including his "initiation" into the Mungiki and subsequent flight. He further testified regarding his sister's death in 2014, which he attributed directly to his decision to flee from the Mungiki. Specifically, Muhoro stated that shortly before her death, his sister's then-boyfriend, a member of the Mungiki, began mistreating her after he discovered that Muhoro had left the Mungiki. In his testimony, Muhoro claimed that, though his sister's cause of death was officially listed as "cerebral malaria," he and his family believed her boyfriend poisoned her. Muhoro attested that his suspicions regarding his sister's cause of death reinforced his fear of returning to Kenya.

In addition to his oral testimony, Muhoro submitted country reports and news articles concerning Mungiki activity in

---

violating or attempting or conspiring to violate that section are deportable, 8 U.S.C. § 1227(a)(3)(B)(iii). The parties agree that the overt acts described in Muhoro's indictment meet the elements of 18 U.S.C. § 1546.

Kenya and the Kenyan government's failure to rein in that group and, separately, an affidavit from his father corroborating his account of events in Kenya.

On April 25, 2017, the IJ issued an oral decision denying all of Muhoro's claims. After noting that Muhoro failed to seek asylum within one year of his last entry into the United States in 2007 (following his visit to Kenya), as required by statute, the IJ determined that he failed to demonstrate changed or extraordinary circumstances that would justify extending that deadline. In this regard, the IJ found that Muhoro did not sufficiently corroborate his claim that his sister had been murdered because of his status as a Mungiki deserter. The IJ also rejected Muhoro's ineffective assistance of counsel argument based on Siddiqui's purported advice that he could only remain in the country through marriage to a U.S. citizen, concluding that Muhoro failed to corroborate that advice or the existence of a formal attorney-client relationship.

Separately, the IJ rejected Muhoro's claims for withholding of removal and CAT-based relief based on her conclusion that Muhoro could not demonstrate either past persecution or a clear probability of future persecution. While the IJ found that Muhoro presented compelling evidence of the Mungiki's dangerousness and risks posed to defectors from that organization,

- 7 -

she did not credit Muhoro's assertion that his claimed "initiation" was in fact sufficient to make him a member of that group.

On review, the BIA adopted almost the entirety of the IJ's findings and opinion and dismissed the appeal. The only area in which the BIA's decision deviated from that of the IJ came in its discussion of Muhoro's membership in the Mungiki. Rather than assessing the credibility of Muhoro's testimony that he joined that organization, the BIA concluded only that Muhoro failed to demonstrate past persecution or "a clear possibility of future persecution in Kenya today."

Muhoro timely appealed the BIA's order dismissing his appeal.

## II.

"We review the BIA's legal conclusions de novo, with appropriate deference to the agency's interpretation of the underlying statute in accordance with administrative law principles." Toribio-Chavez v. Holder, 611 F.3d 57, 62 (1st Cir. 2010) (internal quotation marks and citation omitted). In addition, "[this court] review[s] the agency's factual findings, including credibility determinations, under the substantial evidence standard, and may overturn those findings only if any reasonable adjudicator would be compelled to conclude to the contrary." Id. (quotation marks, alteration, and citation omitted). "When, as here, the BIA adopts and affirms part of the

IJ's ruling and further justifies the IJ's conclusions, we review both the BIA's and IJ's opinions." Nako v. Holder, 611 F.3d 45, 48 (1st Cir. 2010); see also Sunoto v. Gonzales, 504 F.3d 56, 59-60 (1st Cir. 2007)("When the BIA adopts and affirms an IJ's decision, we review the IJ's decision to the extent of the adoption, and the BIA's decision as to any additional ground." (internal quotation marks and citation omitted)).

Muhoro argues that the BIA and IJ erred in their determinations that he did not demonstrate "extraordinary" or "changed" circumstances meriting extension of the asylum filing deadline and, separately, failed to establish past persecution or a well-founded fear of future persecution or torture. We examine these claims of error in turn.

**A.**

As a threshold matter, a person seeking asylum is generally required to "demonstrate[] by clear and convincing evidence" that he or she applied for that relief within a year of arriving in the United States. 8 U.S.C. § 1158(a)(2)(B). Where the applicant fails to do so, his or her application may yet be considered if the applicant demonstrates "changed circumstances which materially affect the applicant's eligibility for asylum or extraordinary circumstances relating to the delay in filing an application." Id. § 1158(a)(2)(D).

Here, the untimeliness of Muhoro's application is not in dispute, as Muhoro concedes that he failed to seek asylum within a year of his most recent entry into the United States in 2007. See 8 C.F.R. § 1208.4(a)(2)(ii) (specifying that the one-year period for timely filing of an asylum claim "shall be calculated from the date of the alien's last arrival in the United States or from April 1, 1997, whichever is later."). Rather, he contends that the death of his sister and the erroneous legal advice he claims to have received from Siddiqui[4] constituted "changed" and "extraordinary" circumstances, respectively, and argues that the IJ and BIA erred in finding otherwise.

Muhoro's challenge ignores the limitations on our review. "This Court lacks jurisdiction to review an agency's findings regarding timeliness or its application of the 'extraordinary circumstances' exception . . . unless an alien identifies a legal or constitutional defect in the decision." Olmos-Colaj v. Sessions, 886 F.3d 168, 174-75 (1st Cir. 2018)

---

[4] Muhoro also argues that his then-attorney's failure to include a claim for asylum in his initial responsive pleading in the immigration court constituted ineffective assistance of counsel. As noted above, however, the IJ subsequently permitted Muhoro to amend his initial pleading to reflect, inter alia, his asylum claim. Muhoro provides no explanation as to how that oversight continues to impact or prejudice his rights, and so we do not address it further. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.").

(internal quotation marks, alterations, and citations omitted).

The same rule applies to the agency's application of the "changed circumstances" exception.  See 8 U.S.C. § 1158(a)(3); see also Chahid Hayek v. Gonzales, 445 F.3d 501, 506-07 (1st Cir. 2006) (per curiam).  "[F]indings as to timeliness and changed [or extraordinary] circumstances are usually factual determinations," Chahid Hayek, 445 F.3d at 507 (internal quotation marks and citation omitted), and the IJ's rulings here were no exception. The IJ found that evidence concerning the circumstances of Muhoro's sister's death was insufficient to substantiate his claim that she was murdered, noting documentary evidence contradicting that conclusion and inconsistencies within Muhoro's own account of her death.  The IJ likewise found little evidence to substantiate Muhoro's claim that attorney Siddiqui advised him to marry a U.S. citizen for purposes of obtaining immigration status, emphasizing the lack of corroboration of any formal attorney-client relationship and Muhoro's "vague" testimony concerning his interaction with Siddiqui.[5]

---

[5] The IJ and BIA also found that Muhoro's ineffective effective assistance of counsel claim was not supported by the evidence demanded by Matter of Lozada, 19 I & N Dec. 637 (BIA 1998), which requires:

> (1) an affidavit explaining the petitioner's agreement with counsel regarding legal representation; (2) evidence that counsel has been informed of the allegations of ineffective assistance and has had an opportunity to respond; and (3) if it is

- 11 -

Muhoro does not point to any legal or constitutional error in these determinations, but merely contends that he presented evidence and testimony that supports his claims and contradicts the agency's contrary conclusions. However, those arguments are just "another way of saying that the agency got the facts wrong, which is simply a factual claim . . . that [] cannot defeat the operation of the jurisdiction-stripping provision." Rashad v. Mukasey, 554 F.3d 1, 5 (1st Cir. 2009). Accordingly, we lack jurisdiction to review the agency's determination that Muhoro's asylum application was untimely, and we move on to his remaining claims.

**B.**

Muhoro next contends that the agency erred in denying his petition for withholding of removal. "To prove an entitlement to withholding of removal, an alien bears the burden of demonstrating a clear probability that her life or freedom would be threatened in her homeland on account of her race, religion, nationality, membership in a particular social group, or political opinion." Arévalo-Girón v. Holder, 667 F.3d 79, 82

asserted that counsel's handling of the case involved a violation of ethical or legal responsibilities, a complaint against the attorney filed with disciplinary authorities or, in the alternative, an explanation for why such a complaint has not been filed.

García v. Lynch, 821 F.3d 178, 180 n.2 (1st Cir. 2016).

(1st Cir. 2012). A petitioner may satisfy this burden by showing either that he or she has "already suffered such persecution in [his or her country of removal], thereby creating a rebuttable presumption that [he or she] will suffer the same upon removal," or by demonstrating that, "more likely than not, his [or her] life or freedom will be threatened on account of" one of the enumerated protected grounds. Ruiz-Escobar v. Sessions, 881 F.3d 252, 259 (1st Cir. 2018) (internal quotation marks and citations omitted).

"Persecution is a fluid term, not defined by statute[,]" Ordonez-Quino v. Holder, 760 F.3d 80, 87 (1st Cir. 2014), and "courts usually assess whether harm rises to the level of persecution on a case-by-case basis," id. at 88. This court's previous rulings make clear, however, that "persecution requires more than unpleasantness, harassment, and even basic suffering." de Zea v. Holder, 761 F.3d 75, 80 (1st Cir. 2014) (internal quotation marks and citation omitted). Rather, "[t]o show past persecution, the discriminatory experiences must have reached a fairly high threshold of seriousness, as well as occurred with some regularity and frequency." Martínez-Pérez v. Sessions, 897 F.3d 33, 39-40 (1st Cir. 2018) (internal quotation marks and citation omitted).

Muhoro's claims of both past and future persecution are predicated on his claimed status as a "Mungiki defector." For purposes of this analysis, we follow the lead of our sister

- 13 -

circuits and assume that Mungiki defectors constitute a "particular social group" within the statute's protection. See, e.g., Gatimi v. Holder, 578 F.3d 611, 616-17 (7th Cir. 2009); Gathungu v. Holder, 725 F.3d 900, 907-08 (8th Cir. 2013). Even taking that fact in Muhoro's favor arguendo, however, we still find that the agency's decision was supported by substantial evidence.

## 1.  Past Persecution

Turning first to the claimed past persecution, we find more than sufficient evidence in the record to support the IJ's conclusion that no such persecution had occurred.  As the IJ noted, following the initiation ceremony, Muhoro continued to reside in Kenya for seven years, during which time he attended high school and college without suffering any apparent harm.  Moreover, Muhoro does not claim to have suffered any harm when he returned to the country for two weeks in 2007.  In fact, outside of the initiation ceremony itself, Muhoro does not point to any action taken against him by the Mungiki.

Recognizing this shortcoming, Muhoro turns to Mungiki acts targeting his family.  He points first to the threatening notes allegedly left in his parents' house.  Despite his insistence that those threats, alone, are sufficient to satisfy his burden, "[d]eath threats rise to the level of persecution only when so menacing as to cause significant actual suffering or

- 14 -

harm." Hernandez-Lima v. Lynch, 836 F.3d 109, 114 (1st Cir. 2016) (internal quotation marks and citation omitted). While it is not necessary to show that the threats resulted in actual or attempted follow through, "the presence or absence of physical harm (and, indeed, the degree of harm inflicted) remains a relevant factor in determining whether mistreatment rises to the level of persecution." Martínez-Pérez, 897 F.3d at 41 (internal quotation marks and citations omitted); see also Touch v. Holder, 568 F.3d 32, 40 (1st Cir. 2009) (holding that finding of no past persecution was not undermined by death threat that was not accompanied by actual harm). Here, we see nothing in the record that shows those notes resulted in "actual suffering or harm," Hernandez-Lima, 836 F.3d at 114, and so do not view those threats as compelling reversal of the IJ's decision.

Muhoro also directs our attention to the deaths of his cousins, allegedly at the hands of the Mungiki. However, there is no suggestion that those deaths were in any way tied to Muhoro or any targeting of him, and so they are irrelevant to whether Muhoro himself was persecuted.[6]

_____

[6] Muhoro does not assert that his sister's death, if credibly attributed to her then-boyfriend, constitutes an act of past persecution against him. Instead, he merely argues that the IJ erred in finding his testimony on her death incredible. However, for purposes of their withholding analysis, both the IJ and BIA assumed Muhoro's credibility on that point and still found that he failed to establish past persecution. Muhoro does not identify

- 15 -

Accordingly, we find ample basis in the record to support the agency's conclusion that Muhoro did not suffer past persecution, and the facts on which he relies do not "point[] unerringly in the opposite direction." Lumataw v. Holder, 582 F.3d 78, 91 (1st Cir. 2009) (internal quotation marks and citations omitted).

## 2. Future Persecution

Despite our conclusion that the IJ and BIA did not err in finding no past persecution, Muhoro can still succeed if he "can satisfy a two-part inquiry," demonstrating that he "genuinely fears future persecution and that [his] fears are objectively reasonable." Martínez-Pérez, 897 F.3d at 41 (internal quotation marks and citation omitted).

While Muhoro argues that the decisions below failed to make any finding about his likelihood of suffering future harm, we disagree. We acknowledge that the IJ could have been clearer on this point; however, her decision unmistakably concludes that Muhoro did not face a sufficient risk of future persecution. After acknowledging Muhoro's evidence that "ex-Mungiki members do face serious harm, especially high-profile members," the IJ found that this risk did not extend to Muhoro due to the limited duration of

---

any additional fault in the agency's determination, and so further argument along those lines is waived.

his purported affiliation with that group.[7]  The BIA approved of this predictive finding and added its own observation that Muhoro had not been subject to any retribution subsequent to his "initiation," suggesting a low probability of future targeting.

We again find that these conclusions are supported by substantial evidence.  Our basis for doing so is largely the same as that stated in the preceding section, which we need not reprise here.  Suffice it to say the evidence that Muhoro both lived, undisturbed, in Kenya for seven years and later visited the country without consequence provides a sufficient basis for the agency's denial of withholding of removal.  Cf. Chen Qin v. Lynch, 833 F.3d 40, 45 (1st Cir. 2016) (rejecting claim of future persecution where petitioner was able to relocate safely to her brother's home in her native country); Cabas v. Holder, 695 F.3d 169, 174 (1st Cir. 2012) (finding that petitioner's claim of future persecution was "undermined by the fact that he returned to [his home country] for a month . . . after the prior beating and threats to his safety").

---

[7] The IJ, relying on Cantarero v. Holder, 734 F.3d 82 (1st Cir. 2013), also concluded that Mungiki defectors were not a particular social group protected by statute, providing an independent reason for denying withholding of removal.  Notwithstanding the analysis in Cantarero, we assume arguendo that Mungiki defectors are a qualifying group, and hold that the agency's conclusion that Muhoro has not been and would not be persecuted based on his membership therein is supported by substantial evidence.

                    *                 *                 *

     Accordingly, we find no error in the IJ and BIA's denial

of Muhoro's claim for withholding of removal and move to consider

his claim for relief under the CAT.

                              **c.**

     In his final claim, Muhoro seeks relief under the CAT

based on his fear that the Mungiki will torture him if he returns

to the country and his claim that the Kenyan government is either

unable or unwilling to prevent them from doing so.  "An applicant

for protection under [the] CAT bears the burden of proving that it

is more likely than not that [he or] she will be tortured if

returned to [his or] her country of origin."  Costa v. Holder, 733

F.3d 13, 17 (1st Cir. 2013); see also 8 C.F.R. § 1208.16(c).

Unlike withholding claims, there is no need to show a nexus between

the torture and some protected status; however, the claimant must

show that the torture would be "inflicted by or at the instigation

of or with the consent or acquiescence of a public official or

other person acting in an official capacity."  Costa, 733 F.3d at

17 (quoting 8 C.F.R. § 1208.18(a)(1) (internal quotation marks

omitted)).

     The    same    evidence    that    supports    the    agency's

determination that Muhoro failed to demonstrate a sufficient risk

of future persecution justifies its conclusion vis-à-vis his risk

of torture.  Muhoro points to no additional evidence to support

                             - 18 -

his claim, instead largely repeating his earlier arguments.[8]  Our review, limited as it is, considers only whether the IJ's and BIA's determinations were supported by substantial evidence, and we have no difficulty in concluding that they were.  Accordingly, Muhoro's claim for relief under the CAT is denied.

### III.

For the foregoing reasons, the petition for review is <u>dismissed</u> as to the asylum claim and <u>denied</u> as to the claims for withholding of removal and relief under the CAT.

---

[8] Muhoro makes passing reference to "country conditions evidence" in the record, which discusses the risks of torture in Kenya generally.  However, "[t]hese reports do not relieve him of the obligation to point to specific evidence indicating that he, personally, faces a risk of torture because of these alleged shortcomings.  Such specificity is a necessary element of a CAT claim." <u>Alvizures-Gomes</u> v. <u>Lynch</u>, 830 F.3d 49, 55 (1st Cir. 2016).